Vacated and remanded by published opinion. Judge KING wrote the majority opinion, in which Chief Judge TRAXLER and Judges MOTZ, GREGORY, SHEDD, DUNCAN, KEENAN, WYNN, DIAZ, FLOYD, THACKER, and HARRIS joined. Judge WILKINSON wrote an opinion concurring in part and dissenting in part, in which Judge AGEE joined. Judge NIEMEYER wrote a dissenting opinion.

ON REHEARING EN BANC

KING, Circuit Judge:
Reya C. Boyer-Liberto, the African-American plaintiff in these civil rights proceedings, alleges that within a single twenty-four-hour period in September 2010, while working as a cocktail waitress at the Clarion Resort Fontainebleau Hotel in Ocean City, Maryland (the “Clarion”), she was twice called ■ a “porch monkey” and threatened with the loss of her job by a Caucasian restaurant manager. Soon after reporting to higher-ups at the hotel that she had been racially harassed, Liber-to was fired by the Clarion’s owner, Dr. Leonard P. Berger. This action against the Fontainebleau Corporation and Berger ensued, with Liberto asserting claims of hostile work environment and retaliation, under both Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. The district court awarded summary judgment to the defendants, see Boyer-Liberto v. Fontainebleau Corp., No. 1:12-cv-00212, 2013 WL 1413031 (D.Md. Apr. 4, 2013), ECF No. 52, and a not-fully-unanimous panel of this Court affirmed, see Boyer-Liberto v. Fontainebleau Corp., 752 F.3d 350 (4th Cir.2014). The panel’s decision was vacated, however, by our grant of rehearing en banc.
As explained below, we now vacate the judgment of the district court and remand for further proceedings on Liberto’s claims. In so doing, we underscore the Supreme Court’s pronouncement in Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), that an isolated incident of harassment, if extremely serious, can create a hostile work environment. We also recognize that an employee is protected from retaliation when she reports an isolated incident of harassment that is physically threatening or humiliating, even if a hostile work environment is not engendered by that incident alone. Finally, we specify that, to the extent today’s decision is in conflict with Jordan v. Alternative Re *269 sources Corp., 458 F.3d 332 (4th Cir.2006), Jordan is hereby overruled.
I.
A.
The record in this matter reflects that on August 4, 2010, Liberto began working at the Clarion, an oeeanfront hotel containing guest rooms, several restaurants and bars, a nightclub, and a conference center with meeting and banquet facilities.[1] During the seven weeks she was employed with the Clarion’s Food and Beverage Department, Liberto worked in assorted roles, including restaurant hostess, restaurant and banquet server, bartender, and cocktail waitress. According to' Liberto, the Clarion assigned her that variety of jobs so that she could learn all positions within the Food and Beverage Department as part of her training.
On the night of September 14, 2010, Liberto was working as a cocktail waitress in the Clarion’s nightclub. One of her customers ordered a “Hula Hula,” a drink that is time-consuming to prepare. The bartender in the adjacent main bar refused to fill the order, explaining to Liberto that other nightclub patrons would see the Hula Hula and want that drink, too. In an effort to please her customer and after consulting immediate supervisor Jamie Avery, Liberto went beyond the main bar to the pub bar, where she found a bartender willing to make a Hula Hula. Once the drink was prepared, Liberto wanted to avoid a confrontation with the bartender in the main bar, so she chose a new path back to the nightclub that took her through the restaurant kitchen. Liberto carried the Hula Hula briskly through the kitchen and across the nightclub to her customer’s table. She then went to a server station, which was located in the nightclub several feet from the kitchen doors, to print a guest check.
At that point, Liberto was confronted by Trudi Clubb, a white Food and Beverage Manager at the Clarion. Unbeknownst to Liberto, Clubb had been yelling at Liberto as she passed through the kitchen carrying the Hula Hula. Liberto soon learned that Clubb was livid because she believed that Liberto had heard but ignored her. As Liberto worked at the server station, Clubb came through the kitchen doors, loudly screaming, “Hey, girl that can’t hear.” J.A. 237.[2] Clubb, still shouting, quickly approached Liberto, who turned her face away from Clubb in an effort to remain calm — a move that made Clubb even more furious. Clubb then came so close to Liberto that Liberto could feel Clubb’s breath on her face as Clubb stood at Liberto’s side. Indeed, continuing to yell at Liberto, Clubb sprayed Liberto’s face with saliva. Clubb’s message was that Liberto should have neither walked through the kitchen nor ignored Clubb, and Liberto repeatedly indicated that she understood and agreed.
*270 Clubb’s shouting nonetheless persisted, even as Liberto left the server station to tend to nightclub customers. Clubb was now loudly berating Liberto for walking away from her, at first following Liberto into the nightclub and then moving back to the server station. Upon Liberto’s subsequent return to that area, Clubb finally proceeded to exit the nightclub into the kitchen. As she did so, Clubb threatened Liberto in words that included, “[I’m] going to get [you]” and “[I’m] going to make [you] sorry.” J.A. 252-53. Clubb then concluded her threat by turning to look at Liberto and calling her either a “damn porch monkey” or a “dang porch monkey.” See id. at 258.
Upon arriving for a dinner shift the following day, September 15, 2010, Liberto went to the Clarion’s management office to report Clubb’s conduct to Food and Beverage Director Richard Heubeck. Liberto had just begun talking to Heubeck when she was interrupted by Clubb, who came into the office and said to Liberto, “I need to speak to you, little girl.” J.A. 263. Liberto responded that she was meeting with Heubeck, but Clubb retorted, “I’m more important,” prompting Liberto to follow Clubb out of the office. Id. at 263-64. Clubb and Liberto sat at a nearby table, and Clubb reprimanded Liberto, in a raised and angry voice, for passing through the kitchen the prior night. As the two women then rose from the table and pushed in their chairs, Clubb threatened, “I’m gonna get you. I’m gonna go to [hotel owner] Dr. Berger.” Id. at 266. Her voice still loud and angry though somewhat lower than before, Clubb capped the threat by looking directly at Liberto and again calling her a “porch monkey.” Id. at 266-68.
On September 16, 2010, Liberto arranged to speak with Human Resources Director Nancy Berghauer by telephone the following day. During the September 17 phone call, Liberto complained that she had been racially harassed by Clubb. From handwritten notes, Berghauer prepared a typewritten summary of her discussion with Liberto, which included Li-berto’s allegation that Clubb called her a “porch monkey” on September 15. Ber-ghauer provided the summary on September 17 to Dr. Berger and General Manager Mark Elman, and Elman met with Liberto on September 18 to further discuss her complaint. Meanwhile, although Clubb denied ever using the term “porch monkey,” Heubeck issued her a written notice on September 18 advising that, as “a member of our Food & Beverage Management team ..., [Clubb] is expected to conduct herself as such” and “needs to be cautious the language or phrases she uses can not be perceived as racist or derogatory.” J.A. 311.
According to Dr. Berger, Liberto’s racial harassment complaint of September 17, 2010, prompted him to go to Heubeck that day and ask — for the first time ever— about Liberto’s performance. In Berger’s account, Heubeck gave a negative evaluation of Liberto and attributed her variety of job assignments to failure in every role she tried; thus, after further consulting Elman and Berghauer between September 18 and 20, Berger made the decision to fire Liberto immediately. At the beginning of her scheduled shift on September 21, Li-berto was notified that she was being discharged.
Whether Clubb had been empowered by the Clarion to fire Liberto or take other tangible employment actions against her is unclear on this record. From Liberto’s perspective during her short time as a Clarion employee, Clubb “was just Dr. Berger’s friend and she was just there to say hello and greet people as a glorified hostess.” J.A. 213. Liberto did not know *271 that Clubb held a manager title and did not consider Clubb to be her manager. See id. at 214 (Liberto’s deposition testimony that she reported to Avery and Heu-beck, and that Avery told Liberto “not to go to [Clubb] because [Clubb] did not have the power to do voids or make decisions”). Nevertheless, Clubb conveyed to Liber-to — and Liberto got the message — that Clubb was in a position to have Liberto terminated. Before she had finished just her second week of work at the Clarion, Liberto “felt extremely singled out” by Clubb and perceived that “my position was being threatened” by her. See id. at 277-79 (discussing an August 16, 2010 Twitter message from Liberto to a co-worker saying that Clubb is “after me like [a] starving wol[f] on a bone”). Clubb repeatedly told Liberto “what my place was” and “always made it clear that Dr. Berger would listen to anything she said and wouldn’t believe me.” Id. at 279. Clubb’s conduct led Liberto to understand that Clubb “did have power that I did not have.” Id. at 274. Consistent with that perception, Elman informed Liberto during their September 18, 2010 meeting that Clubb was Liberto’s “boss.” See id. at 324 (September 18 email to Heubeck and Ber-ghauer from Elman recounting what he told Liberto).
B.
On January 23, 2012, after exhausting her administrative remedies with the federal government’s Equal -Employment Opportunity Commission (the “EEOC”), Li-berto filed her complaint in the District of Maryland. The complaint' asserted four claims: one claim each of hostile work environment and retaliation pursuant , to Title VII against solely the Fontainebleau Corporation, trading as the Clarion Resort Fontainebleau Hotel; and one claim each of hostile work environment and retaliation under 42 U.S.C. § 1981 against both the Fontainebleau Corporation and Dr. Berger.
1.
Following discovery, the defendants filed a motion for summary judgment. Contesting the validity of the hostile work environment claims, the defendants focused on just one of the four elements of such a claim, contending that there had been no showing that Clubb’s conduct was severe or pervasive enough to alter Liber-to’s conditions of employment and produce an abusive work environment. See Okoli v. City of Balt., 648 F.3d 216, 220 (4th Cir.2011) (“To demonstrate ... a racially hostile work environment, a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiffs ... race; (3) which is sufficiently severe or pervasive to alter the plaintiffs conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.” (alteration and internal quotation marks omitted)); see also Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir.2001) (explaining that the elements of a hostile work environment claim “are the same under either § 1981 or Title VII”).
With respect to the retaliation claims, the defendants argued that Liberto could not establish that she undertook a protected activity by making her racial harassment complaint to the Clarion. See EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir.2005) (“In order to establish a prima facie case of retaliation, a plaintiff must prove three elements: (1) that she engaged in a protected activity; (2) that her employer took an adverse employment action against her; and (3) that there was a causal link between the two events.”); see also Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 *272 (4th Cir.2004) (recognizing that elements of prima facie § 1981 and Title VII retaliation claims are identical). The defendants elaborated that Liberto’s complaint was not a protectéd opposition activity because she could not' reasonably have believed that Clubb’s conduct was sufficiently severe or pervasive to engender a prohibited hostile work environment. See Navy Fed., 424 F.3d at 406 (explaining that an opposition activity, such as making an internal complaint, is protected where an employee opposes either “employment actions actually unlawful under Title VII” or “employment actions [she] reasonably believes to be unlawful”).
2.
In seeking summary judgment, the defendants substantially relied on our precedent in Jordan v. Alternative Resources Corp., 458 F.3d 332 (4th Cir.2006). There, the African-American plaintiff alleged that, while watching a news report on a workplace television about the capture of the infamous D.C. snipers in 2002, a coworker exclaimed in his presence, “They should put those two black monkeys in a cage with a bunch of black apes and let the apes f[uc]k them.” See Jordan, 458 F.3d at 336. The plaintiff, Jordan, reported the comment to his supervisors and was fired within a month of his complaint. Id. at 337. Jordan then filed suit against his employers, alleging, inter alia, retaliatory discharge in contravention of Title VII and § 1981. Id. The district court dismissed Jordan’s complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, and Jordan appealed to our Court, which affirmed by a split panel decision.
Addressing the Title VII retaliation claim, the opinion of the panel majority related that, under Title VII, “ ‘[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter.’ ” Jordan, 458 F.3d at 338 (quoting 42 U.S,C. § 2000e-3(a)). The majority continued that, “[r]eading the language generously to give effect to its purpose, however, we have also held that opposition activity is protected when it responds to an employment practice that the employee reasonably believes is unlawful.” Id. (citing Navy Fed., 424 F.3d at 406-07).
The Jordan majority observed that the employment practices that may be the subject of protected opposition activity include discrimination under 42 U.S.C. § 2000e-2(a)(l) in the form of “maintaining a racially hostile work environment, i.e., a ‘workplace ... permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.’ ” Jordan, 458 F.3d at 339 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The majority further recognized that “[c]ourts determine ‘whether an environment is sufficiently hostile or abusive by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.’ ” Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 787-88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). As the majority explained, “ ‘simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.’ ” Id. (quoting Faragher, 524 U.S. at 788, 118 S.Ct. 2275). The majority also noted that *273 “hostile work environments generally result only after an accumulation of discrete instances of harassment.” Id. (citing Nat’l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (“Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct.... Such claims are based on the cumulative effect of individual acts.”)).
To assess the merits of Jordan’s Title VII retaliation claim, the panel majority clarified, “the question reduces to whether Jordan complained about an actual hostile work environment or, if there was not one, whether Jordan could reasonably have believed there was one.” Jordan, 458 F.3d at 339. The majority first concluded that no hostile work environment actually existed, in that the “black monkeys” comment — though “unacceptably crude and racist” — “was an isolated response directed at the snipers” rather than “any fellow employee.” Id. at 339-40. The majority underscored that the comment “was a singular and isolated exclamation” that did not and could not have “altered the terms and conditions of [Jordan’s] employment,” and that Jordan did “not describe a workplace permeated by racism, by threats of violence, by improper interference with work, or by conduct resulting in psychological harm.” Id. at 340.
Turning to the issue of Jordan’s reasonable belief, the panel majority concluded that “no objectively reasonable person could have believed that [Jordan’s workplace] was in the grips of a hostile work environment.” Jordan, 458 F.3d at 341. But the majority also acknowledged that, pursuant to Navy Federal, Jordan could rely on a reasonable belief that a hostile work environment “was taking shape.” See id. at 340-41 (“Navy Federal holds that an employee seeking protection from retaliation must have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress.”); see also Navy Fed., 424 F.3d at 406-07 (concluding that plaintiff reasonably believed she was opposing unlawful retaliation by disrupting plan that had been set in motion by employer to terminate another employee for her “[u]nder § 2000e-3(a) as construed by Navy Federal, we cannot simply assume, without more, that the opposed conduct will continue or will be repeated unabated; rather, the employee must have an objectively reasonable belief that a violation is actually occurring based on circumstances that the employee observes and reasonably believes.”) Jordan, 458 F.3d at 341 (emphasis omitted). From there, the majority determined that Jordan could not establish a reasonable belief that a hostile work environment was in progress, in that “no allegation in the complaint suggests that a plan was in motion to create such an environment, let alone that such an environment was even likely to occur.” Id. at 340. Accordingly, the majority opinion affirmed the dismissal of Jordan’s Title VII retaliation claim, as well as his § 1981 retaliation claim.
The Jordan dissent agreed with the panel majority that, to gain protection for his opposition activity, an employee may rely on a reasonable belief that Title VII is in the process of being violated by the conduct being opposed. See Jordan, 458 F.3d at 352 (King, J., dissenting) (citing Navy Fed., 424 F.3d at 406-07). The dissent disputed the majority’s view, however, that Navy Federal requires an employee opposing a potential hostile work environment to prove “that a plan was in motion to create such an environment.” That is, the dissent distinguished the discrete action opposed by the Navy Federal plaintiff (the imminent retaliatory discharge of another employee) from the conduct opposed in *274 Jordan (conduct that, if repeated, could amount to a hostile work environment).
The Jordan dissent concluded that, “[b]y opposing racially charged conduct that he reasonably believes could be part and parcel of a hostile work environment, a reporting employee has opposed the impermissible whole, even absent an independent basis for believing the conduct might be repeated.” Jordan, 458 F.3d at 354. “Indeed,” the dissent emphasized, “we require employees to report such incidents in order to prevent hostile work environments from coming into being.” Id. (referring to employer’s affirmative Ellerth/Faragher defense, see Faragher, 524 U.S. at 807, 118 S.Ct. 2275; Burlington Indus. Inc. v. Ellerth, 524 U.S. 742, 764-65, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), imposing duty on employee to avoid harm by reporting harassment to employer). The dissent further highlighted precedent observing “that an employee’s ‘generalized fear of retaliation does not excuse a failure to report’ harassing conduct, because ‘Title VII expressly prohibits any retaliation against [employees] for reporting ... harassment.’ ” Id. at 355 (alterations in original) (quoting Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 267 (4th Cir.2001)). And, the dissent stressed the Supreme Court’s then-recent edict that “ ‘[interpreting the antiretaliation provision to provide broad protection from retaliation helps assure the cooperation upon which accomplishment of [Title VII’s] primary objective’ — preventing harm — ‘depends.’ ” Id. at 352 (alteration in original) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)).
At bottom, the Jordan dissent recognized that the “black monkeys” comment made by Jordan’s co-worker “is the stuff of which a racially hostile work environment is made,” and thus that “it was entirely reasonable for Jordan to believe that, in reporting the ... comment to his employers, he was opposing a racially hostile work environment.” Jordan, 458 F.3d at 355. The dissent lamented that, because of the panel majority’s opinion to the contrary, “employees in this Circuit who experience racially harassing conduct are faced with a ‘Catch-22.’ ” Id. As the dissent explained those employees’ quandary, “[t]hey may report such conduct to their employer at their peril (as Jordan did), or they may remain quiet and work in a racially hostile and degrading work environment, with no legal recourse beyond resignation.” Id. But see Jordan, 458 F.3d at 342 (the majority’s retort that “Jordan’s dilemma, that the law is inconsistent by both encouraging and discouraging ‘early’ reporting, is presented too abstractly. The strong policy of removing and preventing workplace discrimination can and does coexist with Navy Federal’s objective reasonableness standard”). The opinion of the Jordan majority thereafter withstood a petition for rehearing en banc, which was denied on a 5-5 vote of the judges then in active service. See Jordan v. Alternative Res. Corp., 467 F.3d 378 (4th Cir.2006).
3.
Here, by its decision of April 5, 2013, the district court relied on Jordan and awarded summary judgment to the defendants, adopting their contentions that Clubb’s conduct was not so severe or pervasive as to create a hostile work environment or to instill a reasonable belief in Liberto, such as would protect her from retaliation, that she had been unlawfully harassed. See Boyer-Liberto v. Fontainebleau Corp., No. 1:12-cv-00212, 2013 WL 1413031 (D.Md. Apr. 4, 2013), ECF No. *275 52.[3] In rejecting Liberto’s hostile work environment claims, the district court determined that “[t]he two incidents of use of a racial epithet, assuming they occurred as Liberto testified, simply do not comprise either pervasive or severe conduct, however unacceptable they are.” Id. at *3. The court explained that it had “compare[d] the evidence in this case to that in [three others]” and “conclude[d] the conduct at issue here does not rise to the level of conduct found to be severe or pervasive in those Fourth Circuit cases.” Id. (citing Anderson v. G.D.C., Inc., 281 F.3d 452, 459 (4th Cir.2002) (“Anderson was subjected, on a daily basis, to verbal assaults of the most vulgar and humiliating sort.”); Conner v. Schrader-Bridgeport Int’l, Inc., 227 F.3d 179, 199 (4th Cir.2000) (“Ms. Conner experienced regular, profound humiliation because of her gender, unlike the male machine operators.”); Amirmokri v. Balt. Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir.1995) (“[Amirmokri] testified that for six months ... co-workers abused him almost daily, calling him names like ‘the local terrorist,’ a ‘camel jockey’ and ‘the Emir of Waldorf.’ ”)). The district court then invoked Jordan for the proposition that an “isolated racist comment” is “‘a far cry from ... an environment of crude and racist conditions so severe or pervasive that they alter[] the conditions of [plaintiffs] employment.’” Id. (third alteration in original) (quoting Jordan, 458 F.3d at 340). In concomitantly rejecting Liberto’s retaliation claims, the court again looked to Jordan and ruled that “‘no objectively reasonable person could have believed that the [plaintiffs work environment] was, or was soon going to be, infected by severe or pervasive racist, threatening, or humiliating harassment.’ ” Id. at *4 (alteration in original) (quoting Jordan, 458 F.3d at 341).
Liberto timely noted her appeal, and the matter was reviewed by a three-judge panel of this Court. See Boyer-Liberto v. Fontainebleau Corp., 752 F.3d 350 (4th Cir.2014). The panel decision was unanimous that the defendants were properly awarded summary judgment on Liberto’s hostile work environment claims, in that Clubb’s “use of [the term ‘porch monkey1] twice in a period of two days in discussions about a single incident, was not, as a matter of law, so severe or pervasive as to change the terms and conditions of Liber-to’s employment.” Id. at 356. The panel observed that Liberto had “not pointed to any Fourth Circuit case, nor could she, finding the presence of a hostile work environment based on a single incident.” Id. at 358 (comparing Jordan with Anderson, Conner, and Amirmokri).
The panel was split, however, with respect to Liberto’s retaliation claims. The opinion of the panel majority validated the district court’s summary judgment award on those claims, explaining that, “if no *276 objectively reasonable juror could have found the presence of a hostile work environment, as we today hold, it stands to reason that Liberto also could not have had an objectively reasonable belief that a hostile work environment existed.” Boyer-Liberto, 752 F.3d at 360 (emphasis omitted). Although the panel majority allowed that an “employee’s opposition may be protected before the hostile environment has fully taken form,” the majority faulted Liberto for failing to “present any indicators that the situation at the Clarion would have ripened into a hostile work environment.” Id. In that regard, the majority equated Liberto’s case with Jordan. See id. (“Just as in Jordan, we conclude here that ‘while in the abstract, continued repetition of racial comments of the kind [Clubb] made might have led to a hostile work environment, no allegation in the [record] suggests that a plan was in motion to create such an environment, let alone that such an environment was even likely to occur.’ ” (alterations in original) (quoting Jordan, 458 F.3d at 340)); see also id. at 361 (Shedd, J., concurring) (“Based on this Court’s decision in Jordan ..., I agree with Judge Niemeyer that summary judgment should ... be affirmed on the retaliation claim.”).
The dissent distinguished the facts in this case from those in Jordan and concluded that, “[particularly in light of these significant differences, ... Liberto could have reasonably believed that Clubb’s conduct was actionable.” Boyer-Liberto, 752 F.3d at 363 (Traxler, C.J., concurring in part and dissenting in part) (pointing out that Jordan’s co-worker made a single comment not directed at Jordan or another employee, while Clubb called Liberto herself “the very same name in the very same threatening context” on two consecutive days). In any event, the dissent also questioned whether Jordan was correctly decided. See id. (“I share in the sentiment Judge King expressed so well in his dissent in Jordan that our very narrow interpretation of what constitutes a reasonable belief in this context has placed employees who experience racially discriminatory conduct in a classic ‘Catch-22’ situation.” (alteration and internal quotation marks omitted)).
Following issuance of the panel’s decision, Liberto sought rehearing en banc, and a majority of our judges in regular active service voted to grant Liberto’s petition. Accordingly, the panel’s decision was vacated, and today our en banc Court assesses anew the propriety of the district court’s summary judgment award to the defendants. See 4th Cir. R. 35(c).
II.
We review de novo a district court’s award of summary judgment, viewing the facts in the light most favorable to the nonmoving party. See Laber v. Harvey, 438 F.3d 404, 415 (4th Cir.2006) (en banc). Summary judgment is appropriate “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a).
III.
A.
1.
We begin by addressing Liberto’s hostile work environment claims — an endeavor that leads us to outline pertinent legal principles, including some of those already identified above. Title VII renders it “an unlawful employment practice for an employer ... to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such indi- *277 victual's race, color, religion, sex, or national origin.” 42 U.S.C. § 2000e-2(a)(l). An employer contravenes § 2000e-2(a)(l) by, inter alia, requiring an African-American employee to work in a racially hostile environment. See Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65-67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). A hostile environment exists “[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.” Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (internal quotation marks omitted). Thus, to prevail on a Title VII claim that a workplace is racially hostile, “a plaintiff must show that there is (1) unwelcome conduct; (2) that is based on the plaintiffs ... race; (3) which is sufficiently severe or pervasive to alter the plaintiffs conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer.” Okoli v. City of Balt., 648 F.3d 216, 220 (4th Cir.2011) (alteration and internal quotation marks omitted). The same test applies to a hostile work environment claim asserted under 42 U.S.C. § 1981. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 184 (4th Cir.2001); see also 42 U.S.C. § 1981(a) (providing that “[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts ... as is enjoyed by white citizens”); Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 373, 124 S.Ct. 1836, 158 L.Ed.2d 645 (2004) (recognizing that hostile work environment claims may be brought under § 1981).
Element three of a hostile work environment claim requires a showing that “the environment would reasonably be perceived, and is perceived, as hostile or abusive”; the plaintiff may, but is not required to, establish that the environment is “psychologically injurious.” See Harris, 510 U.S. at 22, 114 S.Ct. 367. Whether the environment is objectively hostile or abusive is “judged from the perspective of a reasonable person in the plaintiffs position.” Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). That determination is made “by looking at all the circumstances,” which “may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee’s work performance.” Harris, 510 U.S. at 23, 114 S.Ct. 367. It “is not, and by its nature cannot be, a mathematically precise test.” Id. at 22, 114 S.Ct. 367.
To be sure, viable hostile work environment claims often involve repeated conduct. See Nat’l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115-17, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002). That is because, “in direct contrast to discrete acts, a single act of harassment may not be actionable on its own.” Id. at 115, 122 S.Ct. 2061. For example, “ ‘mere utterance of an ... epithet which engenders offensive feelings in an employee’ does not sufficiently affect the conditions of employment to implicate Title VII.” Harris, 510 U.S. at 21, 114 S.Ct. 367 (alteration in original) (quoting Meritor, 477 U.S. at 67, 106 S.Ct. 2399). The same goes for “simple teasing [and] offhand comments.” See Faragher v. City of Boca Raton, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998). Importantly, however, an “isolated incident[ ]” of harassment can “amount to discriminatory changes in the terms and conditions of employment,” if that incident is “extremely serious.” Id. (internal quotation marks omitted).
*278 In measuring the severity of harassing conduct, the status of the harasser may be a significant factor — e.g., “a supervisor’s use of [a racial epithet] impacts the work environment far more severely than use by co-equals.” Rodgers v. W.-S. Life Ins. Co., 12 F.3d 668, 675 (7th Cir.1993). Simply put, “a supervisor’s power and authority invests his or her harassing conduct with a particular threatening character.” Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 763, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).
The status of the harasser also is relevant to element four of a hostile work environment claim, which necessitates proof that the harassment is imputable to the employer. On the one hand, “[i]f the harassing employee is the victim’s co-worker, the employer is liable only if it was negligent in controlling working conditions.” Vance v. Ball State Univ., — U.S. -, 133 S.Ct. 2434, 2439, 186 L.Ed.2d 565 (2013); see also Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333-34 (4th Cir.2003) (en banc) (“[T]he employer may be liable in negligence if it knew or should have known about the harassment and failed to také- effective action to stop it.”). On the other hand, where the harasser is the victim’s supervisor, “different rules apply”: The employer is strictly liable for the supervisor’s harassing behavior if it “culminates in a tangible employment action,” but otherwise “may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided.” Vance, 133 S.Ct. at 2439 (citing Faragher, 524 U.S. at 807, 118 S.Ct. 2275; Ellerth, 524 U.S. at 765, 118 S.Ct. 2257). The Ellerth/Faragher defense, in essence, imposes a duty on the victim to report her supervisor’s harassing behavior to the employer. See Barrett v. Applied Radiant Energy Corp., 240 F.3d 262, 268 (4th Cir.2001) (discussing “employee’s reporting requirement” under Faragher and Ellerth). Relatedly, a plaintiff seeking to impute liability to her employer for harassment by a co-worker may not be able to establish the employer’s negligence if she did not report the harassment. See Vance, 133 S.Ct. at 2453 (recognizing that evidence relevant to negligence inquiry would include evidence that employer “failed to respond to complaints”); id. at 2464 (Ginsburg, J., dissenting) (“An employee may have a reputation as a harasser among those in his vicinity, but if no complaint makes its way up to management, the employer will escape liability under a negligence standard.”).
For purposes of the employer’s vicarious liability, the harasser qualifies as a supervisor, rather than a co-worker, “if he or she is empowered by the employer to take tangible employment actions against the victim.” Vance, 133 S.Ct. at 2439 (majority opinion). An employee so empowered is able to “effect a ‘significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.’ ” Id. at 2443 (quoting Ellerth, 524 U.S. at 761, 118 S.Ct. 2257). As such, a supervisor has- the “authority to inflict direct economic injury.” Id. at 2448.
To be considered a supervisor, the employee need not have the final say as to the tangible employment action; instead, the employee’s decision may be “subject to approval by higher management.” Vance, 133 S.Ct. at 2446 n. 8 (citing Ellerth, 524 U.S. at 762, 118 S.Ct. 2257). The Vance Court determined that one of the harassers in Faragher “possessed the power to *279 make employment decisions having direct economic consequences for his victims” based on the following: “No one [had been] hired without his recommendation”; he “initiated firing and suspending personnel”; his performance evaluations “translated into salary increases”; and he “made recommendations regarding promotions.” Id. (internal quotation marks omitted). Additionally, the Court observed that, “even if an employer concentrates all decision-making authority in a few individuals, it likely will not isolate itself from heightened liability under Faragher and Ellerth,” in that those individuals likely will have to rely on the recommendations of others, and “the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies.” Id. at 2452 (citing Ellerth, 524 U.S. at 762, 118 S.Ct. 2257).
2.
In seeking summary judgment on Liber-to’s hostile work environment claims, the defendants’ sole contention was that there had been no showing that Clubb’s conduct was severe or pervasive enough to alter Liberto’s conditions of employment and produce an abusive work environment. Liberto’s counter-arguments included that there was a genuine dispute as to whether the harassment she suffered on September 14 and 15, 2010, was sufficiently severe. To resolve that issue today, we need not— and, in any event, on this record cannot— determine whether Clubb was actually Li-berto’s supervisor or simply her co-worker, a fact relevant to the separate question of the Clarion’s vicarious liability. Nevertheless, we are obliged to consider how Clubb portrayed her authority and what Liberto thus reasonably believed Clubb’s power to be. See Oncale, 523 U.S. at 81, 118 S.Ct. 998 (“[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiffs position.... ”).
The defendants have suggested that, because Liberto understood Clubb to be a “glorified hostess” and not a restaurant manager, see J.A. 213-14, Liberto could not have reasonably perceived that Clubb’s conduct was severe enough to create a hostile work environment. That premise ignores evidence, however, that Clubb repeatedly and effectively communicated to Liberto prior to September 14, 2010, that Clubb had Dr. Berger’s ear and could have Liberto fired. See, e.g., id. at 274 (Liber-to’s deposition testimony that Clubb “did have power that I did not have”); id. at 279 (“I felt extremely singled out and that my position was being threatened and it was very clear.”); id. (“I was told what my place was.... And [Clubb] always made it clear that Dr. Berger would listen to anything she said and wouldn’t believe me.”).
The defendants’ theory also fails to take into account Clubb’s assertion of power in the course of her harassment of Liberto. On September 14, 2010, Clubb berated Liberto’s job performance before threatening “to get [her]” and “make [her] sorry,” and then calling her a “damn porch monkey” or a “dang porch monkey.” See J.A. 252-53, 258. The following day, Clubb obstructed Liberto’s attempted report of racial harassment to Food and Beverage Director Heubeck by telling Liberto, “I need to speak to you, little girl,” and “I’m more important [than Heubeck].” Id. at 263-64. Immediately thereafter, Clubb again reprimanded Liberto, again threatened to “get [her]” and to “go to Dr. Berger,” and again called her a “porch monkey.” Id. at 266. Finally, while speaking with Liberto on September 18 about her racial harassment complaint, General Manager Elman validated Clubb’s *280 assertion of authority by declaring Clubb to be Liberto’s “boss.” Id. at 324.
Properly considering that evidence, we must accept that Liberto believed — and reasonably so — that Clubb could make a discharge decision or recommendation that would be rubber-stamped by Dr. Berger. Thus, in gauging the severity of Clubb’s conduct, we deem Clubb to have been Li-berto’s supervisor. Cf. Vance, 133 S.Ct. at 2446 n. 8, 2452 (recognizing that, for purposes of employer’s vicarious liability, employee may qualify as supervisor if she can initiate tangible employment actions “subject to approval by higher management” or make recommendations on which employer relies). And we view Clubb’s conduct as having the “particular threatening character” of harassment perpetrated by a supervisor against her subordinate. See Ellerth, 524 U.S. at 763, 118 S.Ct. 2257. That perspective is especially appropriate here, where Clubb employed racial epithets to cap explicit, angry threats that she was on the verge of utilizing her supervisory powers to terminate Liberto’s employment.
We also grasp that the use of Clubb’s chosen slur- — “porch monkey” — is about as odious as the use of the word “nigger.” See Spriggs, 242 F.3d at 185. The latter epithet, of course, “is pure anathema to African-Americans.” Id. Similarly, describing an African-American as a “monkey,” and thereby “suggest[ing] that a human being’s physical appearance is essentially a caricature of a jungle beast[,] goes far beyond the merely unflattering; it is degrading and humiliating in the extreme.” Id.; see also, e.g., Green v. Franklin Nat’l Bank of Minneapolis, 459 F.3d 903, 911 (8th Cir.2006) (recognizing that “[pjrimate rhetoric has been used to intimidate African-Americans” and that “[t]he use of the term ‘monkey’ and other similar words,” including the variation “porch monkey,” has “been part of actionable racial harassment claims across the country” (citing cases)). As we and several of our sister courts of appeals have recognized, “‘[pjerhaps no single act can more quickly alter the conditions of employment and create an abusive working environment than the use of an unambiguously racial epithet such as “nigger” by a supervisor in the presence of his subordinates.’ ” Spriggs, 242 F.3d at 185 (quoting Rodgers, 12 F.3d at 675); accord Ellis v. Houston, 742 F.3d 307, 325-26 (8th Cir.2014); Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 577 (D.C.Cir.2013); Rivera v. Rochester Genesee Reg’l Transp. Auth., 743 F.3d 11, 24 (2d Cir.2012); McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1116 (9th Cir.2004).
Consequently, a reasonable jury could find that Clubb’s two uses of the “porch monkey” epithet — whether viewed as a single incident or as a pair of discrete instances of harassment — were severe enough to engender a hostile work environment. Cf. Adams v. Austal, U.S.A., L.L.C., 754 F.3d 1240, 1253-54 (11th Cir.2014) (concluding that, although a Caucasian supervisor’s carving of “porch monkeys” into the aluminum of a ship where he was working with the African-American plaintiff “was an isolated act, it was severe”); Ayissi-Etoh, 712 F.3d at 577 (acknowledging that, where a supervisor “used a deeply offensive racial epithet [‘nigger’] when yelling at Ayissi-Etoh to get out of the office,” that “single incident might well have been sufficient to establish a hostile work environment”); id. at 580 (Kavanaugh, J., concurring) (“[I]n my view, being called the n-word by a supervisor — as Ayissi-Etoh alleges happened to him — suffices by itself to establish a racially hostile work environment.”).
In thus vacating the summary judgment award on Liberto’s hostile work environ *281 ment claims, we identify this as the type of case contemplated in Faragher where the harassment, though perhaps “isolated,” can properly be deemed to be “extremely serious.” See Faragher, 524 U.S. at 788, 118 S.Ct. 2275. We also acknowledge that this is a first for our Court. We reject, however, any notion that our prior decisions, including Jordan v. Alternative Resources Corp., were meant to require more than a single incident of harassment in every viable hostile work environment case. Specifically, we observe that the district court improperly analogized this matter (involving a racial epithet directed at Liberto by her supervisor) to Jordan (concerning a racist remark that was made by a mere co-worker and not aimed at Jordan or any other employee). See 458 F.3d 332, 339-40 (4th Cir.2006). We further note that, in the cases unfavorably compared to this one by the district court, the harassment was so severe and pervasive that there were no close calls. See Anderson v. G.D.C., Inc., 281 F.3d 452, 459 (4th Cir.2002) (“The evidence was unquestionably sufficient to submit Anderson’s hostile environment claim to the jury.”); Conner v. Schrader-Bridgeport Int’l, Inc., 227 F.3d 179, 199 (4th Cir.2000) (“[Tjhere is ample support for the jury finding of severe or pervasive conduct sufficient to constitute a hostile work environment.”); Amirmokri v. Balt. Gas & Elec. Co., 60 F.3d 1126, 1131 (4th Cir.1995) (“A reasonable person could easily find this atmosphere to be hostile.”). Liberto’s case may be different from Anderson, Conner, and Amirmokri, but it is no less worthy of a jury trial.[4]
B.
1.
Turning to Liberto’s retaliation claims, Title VII proscribes discrimination against an employee because, in relevant part, she “has opposed any practice made an unlawful employment practice by this subchapter.” 42 U.S.C. § 2000e-3(a). Employees engage in protected oppositional activity when, inter alia, they “complain to their superiors about suspected violations of Title VII.” Bryant v. Aiken Reg’l Med. Ctrs. Inc., 333 F.3d 536, 543-44 (4th Cir.2003). To establish a prima facie case of retaliation in contravention of Title VII, a plaintiff must prove “(1) that she engaged in a protected activity,” as well as “(2) that her employer took an adverse employment action against her,” and “(3) that there was a causal link between the two events.” EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 405-06 (4th Cir.2005). A prima facie retaliation claim under 42 U.S.C. § 1981 has the same elements. See Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir.2004); see also CBOCS W., Inc. v. Humphries, 553 U.S. 442, 446, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008) (confirming that “ § 1981 encompasses retaliation claims”).[5]
*282 In the context of element, one of a retaliation claim, an employee is protected when she opposes “not only ... employment actions actually unlawful under Title VII but also employment actions [she] reasonably believes to be unlawful.” Navy Fed., 424 F.3d at 406. The Title VII violation may be complete, or it may be in progress. See id. at 406-07; see also Jordan, 458 F.3d at 340-41 (“Navy Federal holds that an employee seeking protection from retaliation must have an objectively reasonable belief in light of all the circumstances that a Title VII violation has happened or is in progress.”); Peters v. Jenney, 327 F.3d 307, 320 (4th Cir.2003) (concluding, in reliance on decisions under Title VII, that “to show protected activity, the plaintiff in a Title VI retaliation case need only prove that he opposed an unlawful employment practice which he reasonably believed had occurred or was occurring” (alterations and internal quotation marks omitted)). In other words, an employee is protected from retaliation when she opposes a hostile work environment that, although not fully formed, is in progress.
a.
The panel majority in Jordan ruled that, where an employee has complained to his employer of an isolated incident of harassment insufficient to create a hostile work environment, the employee cannot have possessed a reasonable belief that a Title VII violation was in progress, absent evidence “that a plan was in motion to create such an environment” or “that such an environment was [otherwise] likely to occur.” See 458 F.3d at 340. We reject that aspect of Jordan today, however, for several reasons.
First of all, the Jordan standard “imagines a fanciful world where bigots announce their intentions to repeatedly belittle racial minorities at the outset, and it ignores the possibility that a hostile work environment could evolve without some specific intention to alter the working conditions of African-Americans through racial harassment.” See Jordan, 458 F.3d at 353-54 (King, J., dissenting). Tellingly, intent to create a hostile work environment is not an element of a hostile environment claim.
The Jordan standard also is at odds with the hope and expectation that employees will report harassment early, before harasser is her supervisor and no tangible employment action has been taken, the victim is compelled by the El-lerth/Faragher defense to make an internal complaint, i.e., “to take advantage of any preventive or corrective opportunities provided by the employer.” See Faragher, 524 U.S. at 807, 118 S.Ct. 2275. Similarly, the victim of a co-worker’s harassment is prudent to alert her employer in order to ensure that, if the harassment continues, she can establish the negligence necessary to impute liability. See Vance, 133 S.Ct. at 2453. The reporting obligation is essential to accomplishing Title VII’s “primary objective,” which is “not to provide redress but to avoid harm.” See Faragher, 524 U.S. at 806, 118 S.Ct. 2275. Thus, we have recognized that the victim is commanded to “report the misconduct, not investigate, gather evidence, and then approach company officials.” See Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 269 (4th *283 Cir.2001). Further, we have emphasized that an employee’s “generalized fear of retaliation does not excuse a failure to report ... harassment,” particularly where “Title VII expressly prohibits any retaliation against [the reporting employee].” See Barrett, 240 F.3d at 267.
But rather than encourage the early reporting vital to achieving Title VII’s goal of avoiding harm, the Jordan standard deters harassment victims from speaking up by depriving them of their statutory entitlement to protection from retaliation. Such a lack of protection is no inconsequential matter, for “fear of retaliation is the leading reason why people stay silent instead of voicing their concerns about bias and discrimination.” See Crawford v. Metro. Gov’t of Nashville & Davidson Cnty., Tenn., 555 U.S. 271, 279, 129 S.Ct. 846, 172 L.Ed.2d 650 (2009) (internal quotation marks omitted). Quelling that fear, the Crawford Court extended protection “to an employee who speaks out about discrimination not on her own initiative, but in answering questions during an employer’s internal investigation.” See id. at 273, 129 S.Ct. 846. To do otherwise, the Court explained, would “create a real dilemma for any knowledgeable employee.” Id. at 279, 129 S.Ct. 846. Namely, -“[i]f the employee reported discrimination in response to the enquiries, the employer might well be free to penalize her for speaking up. But if she kept quiet about the discrimination and later filed a Title VII claim, the employer might well escape liability [by invoking the Ellerth/Faragher defense].” Id. The Court concluded that “[n]othing in the statute’s text or our precedent supports this catch-22.” Id. Of course, the same can be, and has been, said about the Jordan standard. See Jordan, 458 F.3d at 355 (King, J., dissenting) (“As a result of today’s decision, employees in this Circuit who experience racially harassing conduct are faced with a ‘Catch-22.’ ”).
Put succinctly, the Jordan standard is incompatible with Crawford, as well as other Supreme Court decisions directing that Title VII’s antiretaliation provision be interpreted “to provide broad protection from retaliation.” See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006); see also, e.g., Thompson v. N. Am. Stainless, LP, 562 U.S. 170, 173-75, 131 S.Ct. 863, 178 L.Ed.2d 694 (2011). As the Burlington Northern Court explained, Title VII must be read “to provide broader protection for victims of retaliation than for [even] victims of race-based, ethnic-based, religion-based, or gender-based discrimination,” because “effective enforcement could ... only be expected if employees felt free to approach officials with their grievances.” See 548 U.S. at 66-67, 126 S.Ct. 2405 (internal quotation marks omitted).
Finally, we need look no further than Jordan itself to comprehend that the Jordan standard is unsuited to its purpose. In Jordan’s presence, his co-worker made a comment that, “in a single breath, ... equated African-Americans with ‘black' monkeys’ and ‘black apes,’ and implied a savage, bestial sexual predilection acutely insulting to members of the African-American community.” See Jordan, 458 F.3d at 351 (King, J., dissenting). Jordan then did exactly what Title VII hopes and expects: He reported the comment to his employers in an effort to avert any further racial harassment. Because of his internal complaint, however, Jordan was fired. In light of the text and purpose, of Title VII, as well as controlling Supreme Court and Fourth Circuit decisions, Jordan surely merited protection from retaliation. That is,
[w]ithout question, [the comment made by Jordan’s coworker] is the stuff of *284 which a racially hostile work environment is made. On the allegations here, it was entirely reasonable for Jordan to believe that, in reporting the racially charged ‘black monkeys’ comment to his employers, he was opposing a racially hostile work environment.
Id. at 355 (citations omitted). But, by devising and applying the Jordan standard, we denied Jordan any legal recourse for his retaliatory discharge. In these circumstances, the Jordan standard plainly cannot endure.
b.
The question, then, becomes this: What is the proper standard for determining whether an employee who reports an isolated incident of harassment has a reasonable belief that she is opposing a hostile work environment in progress? We conclude that, when assessing the reasonableness of an employee’s belief that a hostile environment is occurring based on an isolated incident, the focus should be on the severity of the harassment. Cf. Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 270-71, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (looking to severity of single incident in evaluating reasonableness of employee’s belief that incident created actionable hostile environment). That assessment thus involves factors used to judge whether a workplace is sufficiently hostile or abusive for purposes of a hostile environment claim' — -specifically, whether the discriminatory conduct “is physically threatening or humiliating, or a mere offensive utterance.” See Harris, 510 U.S. at 23, 114 S.Ct. 367. Of course, a single offensive utterance — e.g., “simple teasing” or an “offhand eomment[],” see Faragher, 524 U.S. at 788, 118 S.Ct. 2275—generally will not create a hostile environment without significant repetition or an escalation in the harassment’s severity. See Ayissi-Etoh, 712 F.3d at 579 (Kavanaugh, J., concurring) (“The more severe the harassment, the less pervasive it needs to be, and vice versa.” (internal quotation marks omitted)). But an isolated incident that is physically threatening or humiliating will be closer — even if not equal — to the type of conduct actionable on its own because it is “extremely serious.” See Faragher, 524 U.S. at 788, 118 S.Ct. 2275.
Accordingly, as relevant here, an employee will have a reasonable belief that a hostile work environment is occurring based on an isolated incident if that harassment is physically threatening or humiliating. This standard is consistent not only with Clark County, but also with other Supreme Court precedent, including Crawford and Burlington Northern. That is so because it protects an employee like Jordan who promptly speaks up “to attack the racist cancer in his workplace,” rather than “remainfing] silent” and “thereby allowing [discriminatory] conduct to continue unchallenged,” while “forfeiting any judicial remedy he might have.” See Jordan, 458 F.3d at 356 (King, J., dissenting).
In sum, under the standard that we adopt today with guidance from the Supreme Court, an employee is protected from retaliation for opposing an isolated incident of harassment when she reasonably believes that a hostile work environment is in progress, with no requirement for additional evidence that a plan is in motion to create such an environment or that such an environment is likely to occur. The employee will have a reasonable belief that a hostile environment is occurring if the isolated incident is physically threatening or humiliating.[6]
*285 2.
Because the defendants contested Liberto’s retaliation claims on the lone ground that she did not engage in a protected activity, our analysis is limited to whether a jury could find that Liberto reasonably believed there was a hostile work environment in progress when she reported Clubb’s use of the “porch monkey” slur. Applying the standard that we adopt today, the answer plainly is “yes.” As we recognized in analyzing Liberto’s hostile work environment claims, “porch monkey” is a racial epithet that is not just humiliating, but “degrading and humiliating in the extreme.” See Spriggs, 242 F.3d at 185. Indeed, we determined that a reasonable jury could find that Clubb’s two uses of “porch monkey” were serious enough to engender a hostile environment. We must further conclude, therefore, in the context of the retaliation claims, that Liberto has made the lesser showing that the harassment was sufficiently severe to render reasonable her belief that a hostile environment was occurring. Accordingly, we vacate the summary judgment award on Liberto’s retaliation claims, in addition to her hostile work environment claims. We also underscore that, on remand, a jury would be entitled to simultaneously reject the hostile work environment claims on the ground that Clubb’s conduct was not sufficiently serious to amount to a hostile environment, but award relief on the retaliation claims by finding that Clubb’s conduct was severe enough to give Liberto a reasonable belief that a hostile environment, although not fully formed, was in progress.
C.
Our good dissenting colleague has a different view of the controlling law, the relevant facts, and even what our en banc majority does and does not say. See post at 293-309 (Niemeyer, J., dissenting). With respect to the hostile work environment claims, there is disagreement over what the Supreme Court meant by this sentence from Faragher:
A recurring point in [our hostile environment] opinions is that simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment.
See 524 U.S. at 788, 118 S.Ct. 2275 (internal quotation marks omitted). We read that sentence to pronounce that an isolated incident of harassment, if extremely seri *286 ous, can create a hostile environment. But, clinging to Faragher’s use of “isolated incidents” in the plural, the dissent posits that only multiple, “extremely serious isolated incidents ... may produce a hostile work environment.” Post at 301.
Clearly, it is the dissent’s interpretation of Faragher — not ours — that is untenable. To illustrate, the dissent elsewhere observes that a hostile environment claim “must be ‘based on the cumulative effect of individual acts,’ ” post at 295 (quoting Morgan, 536 U.S. at 115, 122 S.Ct. 2061), and that, “to be actionable under Title VII, conduct must be so ‘severe or pervasive’ as ‘to alter the conditions of [the victim’s] employment and create an abusive working environment,’ ” id. at 294 (alteration in original) (emphasis added) (quoting Meritor, 477 U.S. at 67, 106 S.Ct. 2399). Strikingly, the dissent does not — and surely cannot — explain what differentiates “isolated incidents” that must be “extremely serious,” from “individual acts” that may be “severe or pervasive.” The dissent also quotes from Morgan that “ ‘a single act of harassment may not be actionable on its own,’ ” id. at 295 (quoting Morgan, 536 U.S. at 115, 122 S.Ct. 2061), without acknowledging the obvious import of Morgan’s use of “may not” rather than “cannot.” And, the dissent itself allows that a single, isolated incident of physical violence may be actionable, id. at 301-02, without even attempting to reconcile that proposition with its reading of Faragher.
Relatedly, the dissent criticizes us for “failing] to note that the portions of Far-agher to which [we] cite[ ] were part of the Supreme Court’s much lengthier discussion — and substantively different message — describing the type of conduct that would not violate Title VII.” Post at 294. In pursuing its position, the dissent simply ignores Faragher’s use of “unless extremely serious” to designate an exception to those isolated incidents that are not unlawful on their own.
Meanwhile, the dissent repeatedly invokes Faragher’s observation, “Mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee would not sufficiently alter terms and conditions of employment to violate Title VII.” See Faragher, 524 U.S. at 787, 118 S.Ct. 2275 (internal quotation marks omitted). But the dissent overemphasizes the first part of that sentence, at one point quoting the entire sentence while underscoring only “[mjere utterance of an ethnic or racial epithet,” see post at 294, and at another point actually omitting the phrase “which engenders offensive feelings in an employee,” see id. at 301-02. Of course, the phrase “which engenders offensive feelings in an employee” is a critical qualifier, signifying “a mere offensive utterance” rather than a more egregious slur that is “physically threatening or humiliating.” See Faragher, 524 U.S. at 787-88, 118 S.Ct. 2275 (explaining that the circumstances relevant to determining “whether an environment is sufficiently hostile or abusive” include “ ‘whether it is physically threatening or humiliating, or a mere offensive utterance’ ” (quoting Harris, 510 U.S. at 23, 114 S.Ct. 367)).
In any event, the dissent consistently minimizes the seriousness of Clubb’s two uses of the “porch monkey” slur by deeming them to be merely offensive as a matter of law. To do so, the dissent invents a test under which harassment cannot rise to the level of humiliating unless it is “publicly humiliating,” and points out that “it appears that no one heard Clubb direct the epithet at Liberto on either occasion.” See post at 302. The dissent also flouts our mandate to view the facts in the light most favorable to Liberto, and insists that, as a fact, “Liberto thought that she was being upbraided by a co-worker, not her supervi *287 sor.” Id. at 302. Regardless of what else Liberto perceived about Clubb’s status, however, there is ample evidence in the record showing that Liberto reasonably believed that Clubb possessed the one supervisory power that mattered: the power to follow through on her threats to have Dr. Berger rubber-stamp Liberto’s discharge.[7]
As for the retaliation claims, the dissent accuses our en banc majority of “gratuitously proceeding] to adopt an unprecedented standard ... that is much broader than necessary to resolve Liberto’s claim[s].” Post at 303. The dissent’s accusation rests on the false premise that we hold as a matter of law that a hostile work environment existed. In reality, we simply conclude that a reasonable jury could find for Liberto with respect to her hostile environment claims. Because it is possible that Liberto will instead come up short at trial on those claims, our retaliation analysis is essential. Indeed, we have emphasized that a jury may find that Clubb’s conduct was insufficiently serious to engender a hostile environment, but severe enough to protect Liberto from retaliation by rendering reasonable her belief that such an environment was underway.
Unfortunately, there are further instances of the dissent’s inaccurate portrayal of today’s decision. For example, although we observe herein that our standard “protects an employee like Jordan” from retaliation, the dissent asserts that we nowhere “indicate that the plaintiff in Jordan had a reasonable belief that a hostile work environment was taking shape at the time he reported his co-worker’s racist comment to his supervisors.” See post at 306. So, for the sake of clarity (though too late to benefit Jordan himself), we state in plain terms that a jury applying our standard could have found that Jordan reasonably believed he was opposing a hostile environment in progress. That is because the “black monkeys” comment uttered to Jordan — like the “porch monkey” slurs aimed at Liberto — could readily be deemed physically threatening or humiliating.
We are entirely unswayed by the dissent’s warning that our standard “will generate widespread litigation over the many offensive workplace comments made everyday that employees find to be humiliating.” See post at 304. Our standard is implicated solely when an employee suffers *288 retaliation for engaging in an oppositional activity, and can be satisfied only by showing the objective reasonableness of the employee’s belief that an isolated incident of harassment was physically threatening or humiliating. We also reject the dissent’s prediction that our “standard will surely generate many new questions” and “much hand-wringing” over which harassing conduct qualifies as sufficiently severe. See id. at 304, 308. Judges and juries have been identifying what is humiliating, as well as what is physically threatening or merely offensive, since at least 1993, when the Supreme Court explained in Harris how to determine whether a workplace is objectively hostile or abusive for purposes of a hostile environment claim. See 510 U.S. at 23, 114 S.Ct. 367.[8]
Finally, we are perplexed and dismayed by the dissent’s assertions that, on the one hand, “Liberto had every right to be offended by Clubb’s use of a racial epithet and acted reasonably and responsibly in reporting the incident,” see post at 305, and that, on the other hand, Liberto spoke up too soon and thereby deprived herself of protection from retaliation. As the dissent would have it, although reporting Clubb’s slur was a sensible thing to do, Liberto should have waited for additional harassment to occur — but not so much harassment that the Clarion could avoid vicarious liability because of a lack of timely notice. Concomitantly, the dissent contends that our decision “manifests a fundamental distrust of employers, assuming that, once a humiliating epithet is uttered, the development of a hostile work environment is a fait accompli — in other words, that employers are powerless or unwilling to prevent a descent into pervasive hostility.” Id. at 308.
Contrary to the dissent, we seek to promote the hope and expectation — ingrained in our civil rights laws and the Supreme Court decisions interpreting them — that employees will report harassment early, so that their employers can stop it before it rises to the level of a hostile environment. Employers are powerless in that regard only if they are unaware that harassment is occurring. But employees will understandably be wary of reporting abuse for fear of retribution. Under today’s decision, employees who reasonably perceive an incident to be physically threatening or humiliating do not have to wait for further harassment before they can seek help from their employers without exposing themselves to retaliation.
IV.
Pursuant to the foregoing, we vacate the judgment of the district court and remand for such other and further proceedings as may be appropriate.

VACATED AND REMANDED

. For purposes of our de novo assessment of the district court’s summary judgment award, we view the facts in the light most favorable to Liberto, as the nonmoving party. See Laber v. Harvey, 438 F.3d 404, 415 (4th Cir.2006) (en banc). Thus, like the district court, we accept that Liberto was called a “porch monkey” on two consecutive days, and that the defendants knew of at least one of those alleged slurs when the decision to discharge Liberto was made. See Boyer-Liberto v. Fontainebleau Corp., No. 1:12-cv-00212, 2013 WL 1413031, at *2 n. 2 (D.Md. Apr. 4, 2013), ECF No. 52. Much of our factual recitation is drawn from Liberto’s deposition testimony; we do not rely on her interrogatory answers, which the district court properly excluded from consideration. See id.

. Citations herein to "J.A. -” refer to the contents of the Joint Appendix filed by the parties in this appeal.

. The district court’s grounds for awarding summary judgment — the lack of severe or pervasive conduct (element three of the hostile work environment claims) and a protected activity (element one of the retaliation claims) — were the sole grounds that had .been propounded by the defendants. See supra Part I.B.l. Regardless, the court acknowledged the balance of the elements of Liberto’s claims and accepted that they had been satisfied. With respect to the hostile work environment claims, that meant Liberto had shown unwelcome conduct (element one), based on her race (element two), which, "[g]iven Clubb’s position in Clarion’s management structure,” was imputable to the employer (element four). See Boyer-Liberto v. Fontainebleau Corp., No. 1:12-cv-00212, 2013 WL 1413031, at *3 (D.Md. Apr. 4, 2013), ECF No. 52. As for thé retaliation claims, the court deemed it “indisputable” that the defendants took an adverse employment action against Liberto (element two) and that there was a causal link between her racial harassment complaint and the adverse employment action (element three). Id. at *4.

. We do not suggest that a jury should be limited to assessing whether Clubb’s two uses of the "porch monkey” slur, without more, created a hostile work environment. A jury also would be-entitled to consider other evidence potentially indicative of severe or pervasive harassment, including Clubb's treatment of Liberto throughout her short tenure at the Clarion; Clubb's shouting, spitting, and stalking on the night of September 14, 2010; and Clubb’s use of the term "little girl” to refer to Liberto on September 15. See, e.g., Conner, 227 F.3d at 197 ("The more serious incidents enumerated here were complemented by numerous additional occurrences that, in isolation, may have seemed less problematic, but which actually served to exacerbate the severity of the situation.”).

. We observe that, although the elements of prima facie Title VII and § 1981 retaliation claims are identical, the causation standard for a Title VII claim may differ from that for a *282 § 1981 claim after the Supreme Court’s decision in University of Texas Southwestern Medical Center v. Nassar, — U.S. -, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013)-(holding that but-for standard of causation applies to Title VII retaliation claims). We need not consider that question today, however, because the defendants have raised no issue with respect to causation.

. Notably, in its brief as amicus curiae supporting Liberto, the EEOC urges us to adopt a *285 standard suggested by the Jordan dissent: that an employee engages in a protected opposition activity when she complains about an isolated incident of harassment that would create a hostile work environment if repeated often enough. See Jordan, 458 F.3d at 354 (King, J., dissenting) ("When the cumulative nature of such an environment is properly considered, it is clear that employees are protected under Title VII from employer retaliation if they oppose conduct that, if repeated, could amount to a hostile work environment.”). When the isolated incident is merely offensive — rather than physically threatening or humiliating — the if — repeated standard might well be appropriate. Contrary to the argument of the defendants, it is not necessarily precluded by the Supreme Court's Clark County decision. That is, although the Court concluded that the Clark County plaintiff had not engaged in a protected opposition activity by reporting an isolated incident that was merely offensive, the Court did so by assessing whether the plaintiff could have reasonably believed that incident alone created a hostile environment. See 121 S.Ct. at 1509-10. The Court did not consider whether the plaintiff could have reasonably believed that a hostile work environment, even though not fully formed, was in progress. In any event, we need not decide herein whether to embrace the if-repeated standard for cases involving isolated, merely offensive incidents of harassment, because this matter involves more serious conduct.

. Notably, although the defendants themselves failed to argue in the district court that Clubb was not actually Liberto's supervisor, the dissent wanders into that issue and declares it "highly doubtful that Clubb ... would qualify as Liberto's supervisor.” See post at 300 (describing Clubb as "an employee whose only influence comes from having the ear of the company’s owner because of their personal friendship”). The dissent's characterization of Clubb is contradicted by portions of the record, including the September 18, 2010 email in which Elman, the Clarion's General Manager, recounted responding to Liberto’s racial harassment complaint by advising her that she and Clubb "need[ed] to learn to work together on a professional level and that [Clubb] was [Liberto’s] boss.” J.A. 324. Rather than grappling with that important evidence from the Clarion's own General Manager, the dissent chastises us for considering what it glibly terms "Elman's apparent understanding of Clubb’s relationship to Li-berto.” See post at 301 n. *.
Meanwhile, two other of our good colleagues deem Clubb to have been Liberto’s mere co-worker and thereby conclude that the Clarion cannot be held vicariously liable for Clubb’s harassment of Liberto. See post at 289-90 (Wilkinson, L, concurring in part and dissenting in part, joined by Agee, L). Those colleagues not only disregard evidence that Clubb was Liberto’s supervisor, but also urge affirmance of the summary judgment award with respect to the hostile environment claims on a ground that the defendants failed to raise or preserve in the district court.

. Two of our colleagues issue dire warnings that today’s decision may cause "employers [to] become speech police,” "employees [to be] estranged from one another,” and "companies [to] become private sector analogues of the surveillance state.” See post at 289 (Wilkinson, J., concurring in part and dissenting in part, joined by Agee, J.). We cannot agree, however, that by simply protecting an employee who, for example, reports a race-based comment that she reasonably believes to be physically threatening or humiliating, we might somehow silence or segregate the workforce.