# IN THE SUPREME COURT OF CALIFORNIA

TWANDA BAILEY,

Plaintiff and Appellant,

v.

SAN FRANCISCO DISTRICT ATTORNEY'S OFFICE et al.,

Defendants and Respondents.

S265223

First Appellate District, Division One
A153520

San Francisco City and County Superior Court
CGC 15-549675

July 29, 2024

Justice Evans authored the opinion of the Court, in which Chief Justice Guerrero and Justices Corrigan, Liu, Kruger, Groban, and Jenkins concurred.

# BAILEY v. SAN FRANCISCO DISTRICT ATTORNEY'S OFFICE

## S265223

Opinion of the Court by Evans, J.

Plaintiff Twanda Bailey sued the San Francisco District Attorney's Office, former District Attorney George Gascon, and the City and County of San Francisco (collectively, the City) for violations of the California Fair Employment and Housing Act (FEHA), Government Code section 12900 et seq.[1]  Under FEHA, it is an unlawful employment practice for an employer to harass an employee because of their race.  (§ 12940, subd. (j)(1).)  It is also an unlawful employment practice for an employer to retaliate against an employee for engaging in protected activity, such as making a complaint of racial harassment in the workplace.  (§ 12940, subd. (h).)

Bailey, who is African-American, alleges that a coworker with whom she shared an office and job duties called her the N-word.  Bailey further alleges that, after she reported this incident, the human resources manager for the District Attorney's Office obstructed the filing of a formal complaint, engaged in a course of intimidating conduct, and ultimately threatened Bailey that she was "going to get it."  Bailey's action against the City alleges she was subjected to racial harassment by her coworker and retaliation by the human resources manager after complaining of the harassment.  The trial court

---

[1]     All further statutory references are to the Government Code, unless otherwise indicated.

granted summary judgment for the City, finding Bailey had failed to make a prima facie showing on her FEHA claims.  The Court of Appeal affirmed, and we granted review.

This case asks us to assess whether certain conduct may be actionable under FEHA.  First, we assess whether a coworker's one-time use of a racial slur may be actionable in a claim of harassment, that is, whether such an incident may be so severe as to alter the conditions of employment and create a hostile work environment.  For the reasons discussed below, we conclude that an isolated act of harassment may be actionable if it is sufficiently severe in light of the totality of the circumstances, and that a coworker's use of an unambiguous racial epithet, such as the N-word, may be found to suffice.  Second, we assess whether a course of conduct that effectively seeks to withdraw an employee's means of reporting and addressing racial harassment in the workplace is actionable in a claim of retaliation, that is, whether such conduct may constitute an adverse employment action.  We conclude that it may.  Applying these standards, the record presents triable issues of fact on Bailey's harassment and retaliation claims.  We therefore reverse the judgment of the Court of Appeal.

## I. BACKGROUND

Because this is an appeal from an order granting a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 (*Yanowitz*).)  A trial court properly grants a motion for summary judgment only if no triable issue exists as to any material fact and the defendant is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Salas v. Sierra Chemical Co.*

(2014) 59 Cal.4th 407, 415.) "The moving party bears the burden of showing the court that the plaintiff 'has not established, and cannot reasonably expect to establish, a prima facie case . . . .' " (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 (*Miller*), citing *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.) On appeal, we examine the record de novo, viewing the evidence in the light most favorable to the plaintiff as the losing party and resolving any evidentiary doubts or ambiguities in her favor. (*Elk Hills Power, LLC v. Board of Equalization* (2013) 57 Cal.4th 593, 606 (*Elk Hills*); *Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 (*Wiener*).)

Bailey began working at the District Attorney's Office in 2001 as a clerk in the records department. The office promoted her in 2011 to an investigative assistant position. Bailey worked alongside Saras Larkin, another investigative assistant. The two sat next to each other in the records room. Bailey is African-American. Larkin is Fijian/East Indian. On January 22, 2015, while in the records room, Larkin told Bailey that she saw a mouse run under Bailey's desk.[2] Bailey was startled and jumped out of her chair. Larkin walked up to Bailey and quietly said, "You [N-words] is so scary."[3]

Immediately following this incident, Bailey left her office and told three coworkers what Larkin had said. Bailey was crying and upset. Although Bailey was offended by Larkin's use of the racial slur, she did not immediately complain to human resources (HR) because she feared harassment and retaliation.

---

[2]     All further dates refer to 2015 unless otherwise specified.

[3]     Epithet redacted here and throughout the opinion.

This fear was based on Bailey's understanding that other employees had been harassed and discriminated against following incidents with Larkin. Specifically, Bailey understood that Larkin was best friends with the office's department personnel officer, Evette Taylor-Monachino, and that Larkin's actions against other African-American women, Davonne Mark and Sydney Fisher, caused them to be reassigned or to separate from the District Attorney's Office. In a declaration, Mark attested to the close friendship between Taylor-Monachino and Larkin. Mark had worked in the records room with Bailey and Larkin but stated that she was reassigned after Larkin made false accusations against her.

On January 23, at an offsite office party, Bailey's supervisor, Alexandra Lopes, overheard a conversation about the incident between Bailey and Larkin. Lopes told Bailey that she planned to notify HR. Bailey felt more comfortable with Lopes reporting it, rather than doing so herself. On January 28, Lopes reported the incident to Sheila Arcelona, the assistant chief of finance and administration. Arcelona conferred with Taylor-Monachino and Eugene Clendinen, the chief administrative and financial officer, who reported directly to the district attorney. They agreed Arcelona should meet with Bailey and Larkin separately, and that Taylor-Monachino, as the department personnel officer, should attend the meetings.

Arcelona and Taylor-Monachino met with Bailey on January 29. Bailey reiterated that Larkin had used an offensive racial slur and confirmed that this was the only time she had heard Larkin use such language. Arcelona informed Bailey that "management would address the issue" and that Bailey should report any inappropriate behavior directly to management. Arcelona and Taylor-Monachino then met with Larkin, who "did

not admit to making the alleged remark." Arcelona counseled Larkin on the city's "Harassment-Free Workplace Policy" and informed her that use of the alleged language was "unacceptable." Larkin asked if Bailey filed a complaint and was told that no complaint had been filed. No further action was taken against Larkin at that time.

Arcelona documented the meetings with Bailey and Larkin and provided a written summary to Clendinen and Taylor-Monachino. Although Taylor-Monachino was the HR representative charged with reporting incidents of workplace harassment to the city's Department of Human Resources (DHR), she did not file a formal complaint as city policy required. Bailey and Larkin shared an office and were familiar with each other's job duties. Although there is some dispute as to the period between 2013 and 2015, it is undisputed that, prior to 2013 and following the incident on January 22, Bailey and Larkin were required to cover for each other during absences. After the meetings with Bailey and Larkin, Arcelona raised the possibility of separating them, but Taylor-Monachino objected, stating "there was no way to do that without creating the appearance that one or the other had done something wrong. And since the allegation had never been proven, [Arcelona] should not take action to separate them." According to Arcelona, Clendinen deferred to Taylor-Monachino.

On March 23, Bailey asked Taylor-Monachino for a copy of the complaint regarding the January 22 incident. Taylor-Monachino informed Bailey that no complaint existed. When Bailey requested that a complaint be filed, Taylor-Monachino refused. Taylor-Monachino stated that Bailey should not have told her coworkers about the incident with Larkin, adding that, by doing so, Bailey could cause a hostile work environment for

Larkin and Larkin's work could be "messed with." Upon leaving the office, Bailey cried due to what she described as Taylor-Monachino's unprofessional behavior. Bailey then took leave from March 27 to April 6.

After the meeting on March 23, Bailey perceived that Taylor-Monachino's conduct toward her changed. Taylor-Monachino ignored Bailey; laughed at her; stared rudely at her; and jeered at her, including by making a comment that Bailey's workers' compensation claim was not "real." According to Bailey, this behavior was continuous and daily. Bailey later testified that she did not believe Taylor-Monachino's conduct toward her had anything to do with race. However, for purposes of summary judgment, it was undisputed that Taylor-Monachino's conduct was in retaliation for Bailey's complaint against Larkin.

On April 17, DHR received a report from someone outside the District Attorney's Office regarding Bailey's complaint about Larkin. On May 22, Bailey met with someone from DHR for an intake interview. Bailey reported that Larkin subjected her to "harassment/hostile work environment" based on race, reiterating her allegations regarding the January 22 incident. Bailey also reported that Taylor-Monachino subjected her to retaliation, recounting the details of their interaction on March 23. Bailey added that Taylor-Monachino's conduct towards her had changed after March 23. As a result, Bailey felt she needed to avoid walking past Taylor-Monachino's office, which was next to the records room where Bailey worked.

On July 20, Arcelona and Lopes met with Bailey to discuss her fiscal year performance review. Bailey received a "Met Expectations" rating of 2 out of 3 on her 2014–2015 performance

review; she had received a "Met Expectations" rating of 2 or 2.5 for each of her two prior performance reviews. The 2014–2015 performance review included a comment regarding two areas in need of improvement: regular attendance and responsiveness to supervisory requests. During the 2014–2015 fiscal year, Bailey had used 24 days of sick leave. Supervisors and other staff also had reported that Bailey seemed annoyed and irritated by standard work requests. Bailey provided a written rebuttal indicating she did not agree with her performance review. Bailey stated she took sick leave and had trouble performing Larkin's duties as a result of stress from working with Larkin and a fear of being accused of creating a hostile work environment for Larkin as previously stated by Taylor-Monachino. Bailey had anxiety attacks when asked to cover Larkin's desk.

On July 22, DHR sent Bailey a letter regarding her complaint. The letter stated that, based on the information provided, Bailey's allegations were "insufficient to raise an inference of harassment/hostile work environment or retaliation" and therefore the department would "not investigate [her] complaint." While DHR acknowledged "the extreme offensiveness of the 'N' word," it stated that one comment was insufficient to create an abusive working environment. Regarding the alleged retaliation, DHR stated, among other things, that Taylor-Monachino's refusal to allow Bailey to file a complaint "would not impair a reasonable employee from making a complaint because [her] complaint had already been reported by Ms. Lopes on January 26, 2015." DHR asserted that Taylor-Monachino's other conduct, such as her unwillingness to speak with Bailey and staring at Bailey were

mere "social slights." DHR administratively closed the complaint.

At the same time, DHR provided the District Attorney's Office with a confidential report that identified corrective action the office should take in response to Bailey's allegations. Pursuant to this report, Clendinen met with Larkin on July 30 and asked her to execute an "Acknowledgement of Receipt and Review" of the city's Harassment-Free Workplace Policy. Clendinen also met with Taylor-Monachino on July 30 and provided her with a memorandum of instruction. The memorandum instructed Taylor-Monachino that she was to accept and formally document all equal employment opportunity complaints and submit the same to DHR within five business days.

On August 12, Bailey reported to Clendinen an incident involving Taylor-Monachino. Bailey stated that, around 6:30 a.m., she was in her car waiting for a parking spot outside the office when Taylor-Monachino pulled up alongside and rolled down her window. Taylor-Monachino gestured in a manner Bailey perceived as threatening. Although Bailey could not hear the words spoken, she saw Taylor-Monachino saying "you are going to get it." Bailey called Clendinen from her car to lodge a complaint. Around 7:30 a.m. on the same day, Bailey saw Taylor-Monachino walking toward her in the office; Bailey felt so intimidated and threatened from the earlier interaction that she immediately walked away from Taylor-Monachino and sat with the front desk personnel until more staff arrived at the office.

At that time, Bailey also reported to Clendinen that she felt threatened and intimidated by Taylor-Monachino since

March 23. Bailey specified that Taylor-Monachino formally greeted other staff but did not acknowledge her; walked by Bailey chuckling to herself; and made comments suggesting Bailey's workers' compensation filings were not "real issues." Bailey stated she no longer walked past Taylor-Monachino's office and would change her route if she saw Taylor-Monachino walking in the same direction. Bailey described feeling as if she had "nowhere to go." Bailey's August 12 report was the first time she brought the issue of Taylor-Monachino's behavior to Clendinen's attention. Shortly thereafter, on August 20, Bailey's psychiatrist provided a letter indicating that Bailey was being treated for severe anxiety and depression that developed as a result of workplace stress.

DHR investigated certain allegations against Taylor-Monachino in August 2015, including Bailey's allegation about the incident on August 12. On October 27, Clendinen sent Bailey a letter summarizing the investigation into her allegation. The letter stated that an outside investigator deemed the allegations "not-sustained," meaning "the alleged misconduct could neither be proved nor disproved, given the existing evidence." The investigation concluded, however, that Taylor-Monachino violated city policies regarding the treatment of coworkers and the public based on a separate incident involving Mark that occurred in the parking lot on August 13. Around this time, the District Attorney's Office issued an office-wide letter announcing the creation of a new HR position, senior personnel analyst. The letter advised that various HR duties, including "[e]mployee complaints/discipline" were being reassigned from Taylor-Monachino to the senior personnel analyst.

Clendinen met with Bailey on November 9. During this meeting, Bailey informed Clendinen that she was not comfortable covering for Larkin. Following that meeting, as part of the office's periodic rotations for investigative assistants, Clendinen approved Larkin's transfer from the records room to another division on a different floor. Clendinen later testified that, despite 10 months having passed since the incident with Larkin, Bailey was still visibly upset at work, which informed his decision to separate the two. Clendinen testified that Bailey had come to his office crying on a few occasions in 2015. On December 16, Bailey requested a six-week leave of absence based on her psychiatrist's recommendation that she needed time off due to "severe workplace stress." The District Attorney's Office approved that request.

On December 30, Bailey filed suit against the City for racial discrimination, racial harassment, retaliation, and failure to prevent discrimination in violation of FEHA. The City moved for summary judgment and the trial court granted that motion. The parties agreed the two primary issues for determination were: (1) whether Bailey could establish a triable issue that there was severe or pervasive racial harassment based on the single allegation that her coworker called her the N-word; and (2) whether Bailey could establish a triable issue that she was subjected to an adverse employment action.

Addressing the first issue, the trial court found that the only race-related allegation in the lawsuit was Larkin saying "You [N-words] is so scary." The trial court noted that Bailey conceded this was the only race-related allegation at issue. To the extent counsel attempted to argue at the hearing that Taylor-Monachino's actions were also race-related, the trial court rejected this argument on the ground that it contradicted

Bailey's response to the City's separate statement and her own deposition testimony. The trial court concluded that no trier of fact could find severe or pervasive racial harassment based on being "called a '[N-word]' by a co-worker on one occasion."

Addressing the second issue, the trial court reasoned that Bailey's 2015 performance review was not an adverse employment action because Bailey presented no evidence showing it could lead to a substantial and material change in the terms and conditions of her employment. Additionally, the trial court noted that, to the extent Bailey relied on Taylor-Monachino's alleged misconduct, an allegation of "social ostracism at the hands of co-workers does not amount to an adverse employment action." Consequently, the trial court found Bailey could not prevail on her retaliation claim.

In an unpublished opinion, the Court of Appeal affirmed the trial court's grant of summary judgment. We granted review.

## II. DISCUSSION

FEHA recognizes that freedom from employment discrimination on specified grounds, including race, is a civil right. (§ 12921, subd. (a).) As a matter of public policy, FEHA declares the need to "protect and safeguard the right and opportunity of all persons to seek, obtain, and hold employment without discrimination or abridgment on account of race . . . ." (§ 12920.) "This court has declared that policy to be 'fundamental.' " (*Brown v. Superior Court* (1984) 37 Cal.3d 477, 485.) The express purpose of FEHA is to provide effective remedies that will eliminate discriminatory practices in the workplace (§ 12920), and its provisions "are to be construed

broadly and liberally" to accomplish that purpose. (*Yanowitz*, *supra*, 36 Cal.4th at p. 1054, fn. 14.)

To that end, FEHA makes it unlawful, subject to certain exceptions not implicated here, for an employer to "discriminate" against an employee "in compensation or in terms, conditions, or privileges of employment" or to "harass" an employee "because of race." (§ 12940, subds. (a), (j)(1).) It is also unlawful for an employer to "discharge, expel, or otherwise discriminate against" an employee because they have opposed practices forbidden under FEHA or filed a complaint, testified, or assisted in any proceeding under FEHA. (§ 12940, subd. (h).)

In interpreting these provisions, California courts often look for guidance in decisions construing federal antidiscrimination laws, including title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Title VII). (*Raines v. U.S. Healthworks Medical Group* (2023) 15 Cal.5th 268, 282.) This is because the antidiscrimination objectives and relevant wording of Title VII are similar to those of FEHA. (*Reno v. Baird* (1998) 18 Cal.4th 640, 647–648.) Where FEHA and Title VII differ, however, the weight of federal precedents diminishes. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1040.) And even as we look to federal authority, we are mindful that FEHA is a state law and we conduct an "independent analysis" of its provisions "using state law principles." (*Ibid.*) With these tenets in mind, we turn to Bailey's harassment and retaliation claims.

### A. Unlawful Harassment Under FEHA

It is an unlawful employment practice for an employer to "harass" an employee based on membership in a protected class, including "because of race." (§ 12940, subd. (j)(1).) "Harassment

of an employee . . . by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (*Ibid.*) Harassment includes "[v]erbal harassment" such as "epithets, derogatory comments or slurs on a basis enumerated in the Act" (Cal. Code Regs., tit. 2, § 11019, subd. (b)(2)(A)); it also includes "[p]hysical" and "[v]isual forms of harassment" (*id.*, subd. (b)(2)(B), (C)).

To prevail on a claim that a workplace is racially hostile under FEHA, an employee must show she was subjected to harassing conduct that was (1) unwelcome; (2) because of race; and (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment. (See *Lyle v. Warner Brothers Television Productions* (2006) 38 Cal.4th 264, 279 [setting out prima facie requirements for sexual harassment claims under FEHA]; *Boyer-Liberto v. Fontainebleau Corp.* (4th Cir. 2015) 786 F.3d 264, 277 (*Boyer-Liberto*) [setting out prima facie requirements for racial harassment claims under Title VII].) In addition, she must establish that the offending conduct was imputable to her employer. (*Lyle*, at p. 279; *Boyer-Liberto*, at p. 277.) The parties here do not dispute that Larkin's conduct was unwelcome and because of race.[4] We therefore turn to consider its severity and the City's liability.

---

[4]  In granting the City's motion for summary judgment, the trial court refused to consider the argument that Taylor-Monachino's conduct also constituted actionable harassment, finding it contradicted Bailey's own deposition testimony that

### 1. *Severe or Pervasive*

Unlike FEHA discrimination claims, which address only *explicit* changes in the "terms, conditions, or privileges of employment" (§ 12940, subd. (a)), harassment claims focus on "situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706 (*Roby*).) In other words, "discrimination refers to bias in the exercise of official actions on behalf of the employer" whereas "harassment refers to bias that is expressed or communicated through interpersonal relations in the workplace." (*Id.* at p. 707.) "Because a harasser need not exercise delegated power on behalf of the employer to communicate an offensive message," harassment claims may be predicated on conduct by supervisors and coworkers alike. (*Id.* at pp. 706–707 [noting "it does not matter for purposes of proving harassment whether the harasser is the president of the company or an entry-level clerk"].)

The standard for workplace harassment claims strikes a "middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury." (*Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17, 21 (*Harris*).) The United States Supreme Court has

---

Taylor-Monachino's conduct was not based on her race. Bailey did not renew this argument on appeal, and the question presented to this Court is whether Larkin's conduct on its own constitutes actionable harassment. We adopt the parties' framing of Bailey's harassment claim and do not consider whether Taylor-Monachino's acts, taken in response to Bailey's complaint of racial harassment, were "because of race."

held: "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment — an environment that a reasonable person would find hostile or abusive — is beyond Title VII's purview." (*Id.* at p. 21.) "But Title VII comes into play before the harassing conduct leads to a nervous breakdown. A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers." (*Id.* at p. 22.) The same standard applies to FEHA. (See *Aguilar v. Avis Rent A Car System, Inc.* (1999) 21 Cal.4th 121, 130 (plur. opn. of George, C. J.) (*Aguilar*); *Miller, supra*, 36 Cal.4th at p. 462.)

Whether a work environment is reasonably perceived as hostile or abusive "is not, and by its nature cannot be, a mathematically precise test." (*Harris, supra*, 510 U.S. at p. 22.) "The working environment must be evaluated in light of the totality of the circumstances." (*Miller, supra*, 36 Cal.4th at p. 462, citing *Harris*, at p. 23.) " 'These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.' " (*Miller*, at p. 462, quoting *Harris*, at p. 23.) " 'The required level of severity or seriousness varies inversely with the pervasiveness or frequency of the conduct.' " (*Reynaga v. Roseburg Forest Products* (9th Cir. 2017) 847 F.3d 678, 687 (*Reynaga*).) " '[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)' " are not sufficient to create an actionable claim of harassment.

(*Id.* at p. 687, quoting *Faragher v. Boca Raton* (1998) 524 U.S. 775, 788 (*Faragher*).)

Here, urging us to affirm the Court of Appeal's holding, the City argues that "[a] single race-based comment by a coworker — even when involving a categorically offensive and impermissible term — over a fourteen year period" can be considered neither "pervasive" nor "severe." According to the City, Larkin's use of a racial slur is not actionable because Larkin "had no authority to direct or supervise Bailey or affect the terms and conditions of her employment." The comment was "one 'offensive utterance' made in a private conversation between two coworkers." Bailey responds that, under prevailing FEHA principles and standards, the Court of Appeal's holding "that a co-worker's, as opposed to a supervisor's, one-time infliction of [a] slur is categorically non-actionable under FEHA . . . is neither compelled nor warranted." We agree with Bailey that the Court of Appeal placed undue emphasis on the speaker's status as a coworker.

The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position. (*Miller*, *supra*, 36 Cal.4th at p. 462; *Oncale v. Sundowner Offshore Services, Inc.* (1998) 523 U.S. 75, 78 (*Oncale*).) We acknowledge, as has the Ninth Circuit before us, that "[r]acially motivated comments or actions may appear innocent or only mildly offensive to one who is not a member of the targeted group," but "intolerably abusive or threatening when understood from the perspective of a plaintiff who is a member of the targeted group." (*McGinest v. GTE Service Corp.* (9th Cir. 2004) 360 F.3d 1103, 1116 (*McGinest*).) We must therefore consider allegations of a racially hostile workplace "from the perspective of a reasonable person belonging to the

racial or ethnic group of the plaintiff." (*Id.* at p. 1115; accord, *Nazir v. United Airlines, Inc.* (2009) 178 Cal.App.4th 243, 264 (*Nazir*).) This allows us to "recognize forms of discrimination that are real and hurtful, and yet may be overlooked if considered solely from the perspective of an adjudicator belonging to a different group than the plaintiff." (*McGinest*, at p. 1116.)

Turning to the conduct at issue in this case — the one-time use of a racial slur — we begin in a place of agreement with the Court of Appeal: "a single racial epithet can be so offensive it gives rise to a triable issue of actionable harassment." (*Bailey v. San Francisco District Attorney's Office* (Sept. 16, 2020, A153520) [nonpub. opn.], as mod. on denial of rehg. Oct. 6, 2020 (*Bailey*), citing *Boyer-Liberto*, *supra*, 786 F.3d at p. 264.) As noted in *Boyer-Liberto*, although viable hostile work environment claims often involve repeated conduct, it is not required. (*Boyer-Liberto*, at p. 277.) The foundational high court standard provides that actionable harassment must be " 'sufficiently severe *or* pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " (*Harris*, *supra*, 510 U.S. at p. 21, italics added; see also *Ayissi-Etoh v. Fannie Mae* (D.C. Cir. 2013) 712 F.3d 572, 579 (conc. opn. of Kavanaugh, J.) (*Ayissi-Etoh*) ["The test set forth by the Supreme Court is whether the alleged conduct is 'sufficiently severe *or* pervasive' — written in the disjunctive — not whether the conduct is 'sufficiently severe *and* pervasive.' "].) This standard allows that "an isolated incident of harassment, if extremely serious, can create a hostile work environment." (*Boyer-Liberto*, at p. 268, citing *Faragher*, *supra*, 524 U.S. at p. 788; see U.S. Equal Employment Opportunity Commission, Section 15: Race & Color Discrimination (Apr. 19,

2006) 15-VII Equal Opportunity for Job Success, p. 15–37 (EEOC Compliance Manual) ["a single, extremely serious incident of harassment may be sufficient to constitute a Title VII violation"]; *ibid.* ["The more severe the harassment, the less pervasive it needs to be, and vice versa"].)[5]

Identifying the types of isolated incidents that may create a hostile work environment depending on the totality of the circumstances, courts have recognized that use of "an unambiguous racial epithet such as the 'N-word'" may suffice. (EEOC Compliance Manual, *supra*, at p. 15–37 & fn. 130, citing *Spriggs v. Diamond Auto Glass* (4th Cir. 2001) 242 F.3d 179, 185 (*Spriggs*); see also *Woods v. Cantrell* (5th Cir. 2022) 29 F.4th 284, 285 (*Woods*) [holding the district court erred in dismissing a hostile work environment claim based on " 'a single utterance'" of an unambiguous racial epithet by a supervisor]; *Boyer-Liberto*, *supra*, 786 F.3d at pp. 280–281 [vacating summary judgement on a hostile work environment claim and

---

[5] In her briefing, Bailey cites section 12923 (added by Stats. 2018, ch. 955, § 1, eff. Jan. 1, 2019) to elucidate the standards governing claims of harassment, including the proposition that "[a] single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment." (§ 12923, subd. (b).) The City argues section 12923 is inapplicable because the Legislature's declaration of a long-enacted statute's meaning is not controlling and, even if it were, section 12923 does not apply retroactively. We find no need to rely on section 12923 to resolve this case and thus have no cause to address threshold issues regarding its applicability. We note, however, that our holding today appears consistent with section 12923.

identifying the use of unambiguous racial epithets as the type of conduct that, though isolated, may be severe]; *Ayissi-Etoh*, *supra*, 712 F.3d at p. 577 (maj. opn.) [noting that, although other potentially harassing conduct occurred, the "single incident" of a supervisor using an unambiguous racial epithet against an employee "might well have been sufficient to establish a hostile work environment"]; *id.* at p. 580 (conc. opn. of Kavanaugh, J.) [writing separately to express the view that "being called the n-word by a supervisor . . . suffices by itself to establish a racially hostile work environment"].)

In *Boyer-Liberto*, for example, the Fourth Circuit held that a reasonable jury could find "two uses of the 'porch monkey' epithet — whether viewed as a single incident or as a pair of discrete instances of harassment — were severe enough to engender a hostile work environment." (*Boyer-Liberto*, *supra*, 786 F.3d at p. 280.) The Fourth Circuit opined that the "chosen slur" was "about as odious as the use of the '[N-word].' " (*Ibid.*) "Far more than a 'mere offensive utterance,' the '[N-word]' is pure anathema to African-Americans." (*Spriggs*, *supra*, 242 F.3d at p. 185.) "It is beyond question that the use of the '[N-word]' is highly offensive and demeaning, evoking a history of racial violence, brutality, and subordination." (*McGinest*, *supra*, 360 F.3d at p. 1116.) Indeed, the federal circuit courts have observed that "[p]erhaps no single act can more quickly 'alter the conditions of employment and create an abusive working environment,' [citation], than the use of an unambiguously racial epithet such as [the 'N-word'] by a supervisor in the presence of his subordinates." (*Rodgers v. Western-Southern Life Ins. Co.* (7th Cir. 1993) 12 F.3d 668, 675 (*Rodgers*); accord, *Woods*, *supra*, 29 F.4th at p. 285 [5th Cir.]; *Alston v. Town of Brookline* (1st Cir. 2021) 997 F.3d 23, 47; *Lounds v. Lincare, Inc.*

(10th Cir. 2015) 812 F.3d 1208, 1230; *Boyer-Liberto*, *supra*, 786 F.3d at p. 280 [4th Cir.]; *Ellis v. Houston* (8th Cir. 2014) 742 F.3d 307, 325; *Rivera v. Rochester Genesee Regional Transp. Authority* (2d Cir. 2014) 743 F.3d 11, 24; *Ayissi-Etoh*, *supra*, 712 F.3d at p. 577 [D.C. Cir.]; *McGinest*, *supra*, 360 F.3d at p. 1116 [9th Cir.].)

We join the chorus of other courts in acknowledging the odious and injurious nature of the N-word in particular, as well as other unambiguous racial epithets. (See *Alcorn v. Anbro Engineering, Inc.* (1970) 2 Cal.3d 493, 498, fn. 4 [observing the "particularly abusive and insulting" nature of the N-word]; see also Eisenstadt, *The N-Word at Work: Contextualizing Language in the Workplace* (2012) 33 Berkeley J. Emp. & Lab. L. 299, 316 [the experience of being called the N-word is " 'like receiving a slap in the face' "; the " 'injury is instantaneous' "].) The N-word carries with it, not just the stab of present insult, but the stinging barbs of history, which catch and tear at the psyche the way thorns tear at the skin. (See *McGinest*, *supra*, 360 F.3d at p. 1116 [the N-word evokes "a history of racial violence, brutality, and subordination"]; see also *The N-Word at Work*, at p. 316 ["injurious words can cause immediate, severe damage and actual injury because they carry historical meaning — typically, a history of actual discrimination, oppression, and violence"].) Far from "a mere offensive utterance" (*Harris*, *supra*, 510 U.S. at p. 23), this slur may be intrinsically "humiliating" depending on the totality of the circumstances (*ibid.*).[6]

---

[6]     A plurality of this Court stated in *Aguilar*: "[A]lthough a *single use of a racial epithet, standing alone, would not create a*

Though acknowledging that the isolated use of an unambiguous racial epithet may give rise to a triable issue of actionable harassment depending on the totality of the circumstances, the Court of Appeal went on to draw a distinction between the use of such language by a supervisor and the use of such language by a coworker. (*Bailey*, *supra*, A153520.) The Court of Appeal placed great emphasis on this distinction, treating the status of the speaker as dispositive on this record

---

*hostile work environment*, once the jury had determined that a pervasive pattern of such use had created a hostile work environment, the trial court in this case did not abuse its discretion in concluding that each additional instance would perpetuate the hostile environment and should be enjoined." (*Aguilar*, *supra*, 21 Cal.4th at p. 147, fn. 9 (plur. opn. of George, C. J.), italics added.) The severity of harassing conduct was not at issue in *Aguilar* and the italicized statement is dictum. " ' "Language used in any opinion is of course to be understood in the light of the facts and the issue then before the court, and an opinion is not authority for a proposition not therein considered." ' " (*Colmenares v. Braemar Country Club, Inc.* (2003) 29 Cal.4th 1019, 1029.)

Further, to the extent this statement from *Aguilar* has been read to stand for the proposition that the isolated use of a racial epithet *cannot* constitute actionable harassment, we disapprove this reading. Harassing conduct is not considered "standing alone" (*Aguilar*, *supra*, 21 Cal.4th at p. 146, fn. 9 (plur. opn. of George, C. J.)), but "in light of the totality of the circumstances" (*Miller*, *supra*, 36 Cal.4th at p. 462, citing *Harris*, *supra*, 510 U.S. at p. 23). The isolated use of an unambiguous racial epithet *may* be sufficiently severe to create a hostile work environment based on the totality of the circumstances surrounding its use. In other words, it does not require something more; rather, it requires full consideration of the use of the epithet itself, including but not limited to the specific word or words used, the speaker, whether it was directed at the plaintiff, and the larger social context of the workplace.

and faulting Bailey for failing to cite any authority holding that use of a racial epithet by a coworker created a hostile work environment. (*Ibid.*) This is where we part ways with the Court of Appeal. The cases cited above concerning isolated uses of unambiguous racial epithets have involved supervisors. Harassment claims are inherently fact specific, however, and the sufficiency of allegations involving a supervisor does not itself establish the insufficiency of allegations involving a coworker. Nor does our FEHA precedent — which emphasizes the need to consider the totality of the circumstances when assessing the severity of harassment (*Miller*, *supra*, 36 Cal.4th at p. 462) — support a rule based on this distinction. (See also *Oncale*, *supra*, 523 U.S. at p. 81 ["the objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances' "].) As the high court has noted, "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." (*Id.* at pp. 81–82.)

A closer look at one of the cases cited above helps illuminate this point. In *Boyer-Liberto*, the Fourth Circuit noted that the status of the harasser is indeed a factor in considering both the severity of the harassing conduct and whether that conduct is imputable to the employer. (*Boyer-Liberto*, *supra*, 786 F.3d at p. 278.) The court noted that there was a dispute as to status of the speaker in that case, but that it need not, and in fact could not on the record before it, determine whether the speaker was "actually [the plaintiff's] supervisor or simply her co-worker, a fact relevant to the separate question of the [employer's] vicarious liability." (*Id.* at p. 279.) The court went

on to deem the speaker a supervisor for purposes of "gauging the severity of [her] conduct," however, because the record demonstrated that the plaintiff reasonably believed the speaker could make a discharge decision or recommendation that would be rubber-stamped by the actual supervisor. (*Id.* at p. 280; *id.* at p. 279 [noting the speaker had previously communicated that she had the supervisor's ear and could get the plaintiff fired].) Thus, it was not the speaker's official classification that was determinative, but rather, the "constellation of surrounding circumstances, expectations, and relationships" (*Oncale*, *supra*, 523 U.S. at p. 82) that informed the court's analysis.

To be sure, the status of the speaker may be a "significant factor" in assessing the severity of harassing conduct. (*Boyer-Liberto*, *supra*, 786 F.3d at p. 278 [noting that a supervisor's power and authority invests their harassing conduct with a particular threatening character].) But it must be considered, not as a defining element, but as part of the totality of the circumstances. A rigid distinction between supervisors and coworkers fails to take into account the full context of the workplace. In some work environments, for example, an employee may interact with their supervisor only rarely but be required to work intimately with a coworker. Coworkers who share a physical space, such as long-haul truckers driving a route together, or whose work is closely intertwined, such as an ER nurse working side-by-side with other care providers, might find that harassment by such coworkers more quickly alters the conditions of their employment than harassment by a supervisor. It is of vital importance to consider the nature and extent of coworkers' interactions; a coworker whom one sees at the water cooler is quite different than a coworker with whom one shares an office space or work duties. A rigid distinction

between supervisors and coworkers may also ignore informal workplace relationships; not all power appears on an organizational chart. A coworker who holds the manager's ear, is given preferential treatment, or has special sway in the office may have a unique ability to alter the conditions of others' employment without having direct managerial authority. Where a supervisor allows a harassing subordinate to act with impunity or appears to ratify their conduct, this may imbue the subordinate with a certain degree of authority to alter the working conditions of their coworkers.

As the Seventh Circuit recently observed in a case involving isolated use of the N-word by a coworker, case law concerning the severity of harassment has distinguished between supervisors and coworkers. (*Paschall v. Tube Processing Corporation* (7th Cir. 2022) 28 F.4th 805, 814–815.) It "has also, on occasion, been concerned with the number of times a racial epithet was used." (*Id.* at p. 815.) Yet there is no question that conduct by coworkers may give rise to a claim of harassment. (*Roby, supra*, 47 Cal.4th at pp. 706–707; see, e.g., *Reynaga, supra*, 847 F.3d at pp. 687–688 [reversing the district court's grant of summary judgment for the employer in a case involving harassing conduct, including the use of racial epithets, by a coworker].) Nor is there a magic number of slurs that creates a hostile work environment. (*Paschall*, at p. 815 ["There is, however, no spectrum when it comes to the use of a racial epithet in the workplace"]; see, e.g., *Woods, supra*, 29 F.4th at p. 285 [holding the district court erred in dismissing a hostile work environment claim based on " 'a single utterance' " of an unambiguous racial epithet by a supervisor].) "What matters is looking to the totality of the circumstances when determining whether the conduct is sufficiently severe or pervasive to be

actionable." (*Paschall*, at p. 815 [declining to decide whether the one-time use of the N-word by coworkers was actionable because there was prompt and effective remedial action by the employer and thus no liability].)

Applying these standards to the facts of this case, we conclude there is a triable issue of fact whether Larkin's one-time use of the N-word was, under the totality of the circumstances, sufficiently severe so as to create a hostile work environment. We emphasize that, for purposes of summary judgment, we view the evidence in the light most favorable to Bailey, resolving any evidentiary doubts or ambiguities in her favor, including as to the intent behind and impact of Larkin's use of a racial slur. (*Elk Hills*, *supra*, 57 Cal.4th at p. 606; *Wiener, supra*, 32 Cal.4th at p. 1142; see also *Nazir*, *supra*, 178 Cal.App.4th at p. 286 [observing that issues of intent, motive, and the social impact of workplace behavior often are not determinable on paper].)[7]

This case involves an unambiguous racial epithet. " 'The use of the "[N-word]" automatically separates the person addressed from every non-black person; this is discrimination *per se*.' " (*Rodgers*, *supra*, 12 F.3d at p. 675, quoting *Bailey v. Binyon* (N.D.Ill. 1984) 583 F.Supp. 923, 927.) The word was used only once; it was not overheard but directed specifically at Bailey. Although it was not physically threatening, a jury could find that use of the slur was "degrading and humiliating in the

---

[7] Although we do not rely on section 12923, we note that the Legislature has affirmed the decision in *Nazir*, *supra*, 178 Cal.App.4th 243 and "its observation that hostile working environment cases involve issues 'not determinable on paper.' " (§ 12923, subd. (e).)

extreme." (*Spriggs*, *supra*, 242 F.3d at p. 185.) A jury could also find that the modifier "scary" further heightened the slur's impact. (*State v. Liebenguth* (2020) 336 Conn. 685, 706 [observing that modifiers may "intensify the already highly offensive and demeaning character" of the N-word].) Bailey and Larkin shared an office space. They also shared work duties and were asked to cover each other's desks. It was therefore not possible for Bailey to distance herself — physically or otherwise — from Larkin.

The record also shows Larkin had a close relationship with Taylor-Monachino. Though it is subject to dispute and may require further factual development at trial, the record could support the view that Larkin acted with a certain degree of impunity as a result of her relationship with Taylor-Monachino, and thus had a degree of influence over Bailey's working conditions. There was some evidence that Larkin, through her relationship with Taylor-Monachino, interfered with the employment of two other African-American women, Mark and Fisher. At a minimum, in deciding whether it was reasonable for Bailey to have viewed Larkin as acting with a certain degree of impunity in the office, a jury would be entitled to consider Taylor-Monachino's conduct after Bailey made her complaint — conduct that corroborates Bailey's stated fear of reporting Larkin's behavior. Finally, the record could support a finding that Larkin's use of a racial slur interfered with Bailey's work performance and it could reasonably be expected to do so. Bailey's psychiatrist provided a letter indicating she was being treated for severe anxiety and depression that developed as a result of workplace stress. Clendinen acknowledged that Bailey had come to his office crying on a few occasions in 2015 and that she was still visibly upset some 10 months later. To the extent

there is uncertainty regarding whether Bailey's performance was impacted by Larkin's use of a racial slur, Taylor-Monachino's subsequent conduct, or both, ultimately that is a question appropriate for the trier of fact.

### 2. *Corrective Action*

Because Bailey raises a genuine issue of material fact regarding the severity of the harassment, we next consider whether that conduct is imputable to the City. "When the harasser is a supervisor, the employer is strictly liable for the supervisor's actions." (*Roby*, *supra*, 47 Cal.4th at p. 707.) "When the harasser is a nonsupervisory employee, employer liability turns on a showing of negligence . . . ." (*Ibid.*) Specifically, "[h]arassment of an employee . . . by an employee, other than an agent or supervisor, shall be unlawful if the entity, or its agents or supervisors, knows or should have known of this conduct and fails to take immediate and appropriate corrective action." (§ 12940, subd. (j)(1).)

We have not previously had occasion to evaluate whether an employer's response to harassment constitutes "immediate and appropriate corrective action." (§ 12940, subd. (j)(1).) In the analogous context of Title VII claims, the federal courts ask whether an employer has taken " 'adequate remedial measures' " that are " ' "reasonably calculated to end the harassment." ' " (*Nichols v. Azteca Restaurant Enterprises, Inc.* (9th Cir. 2001) 256 F.3d 864, 875.) The reasonableness of the remedy depends on its ability to stop the current harassment and deter future harassment. (*Ibid.*) Our state appellate courts have applied this same standard in assessing claims arising under FEHA. (*Bradley v. Department of Corrections & Rehabilitation* (2008) 158 Cal.App.4th 1612, 1630.)

As an initial matter, the parties dispute the significance of Taylor-Monachino's conduct. Bailey argues that Taylor-Monachino's course of conduct was antithetical to her duty as the HR manager and functioned as ratification of Larkin's use of a racial slur. The City responds that Taylor-Monachino's conduct is largely irrelevant to the inquiry of whether appropriate corrective action was taken because the City took steps to end the *racial* harassment by Larkin and Taylor-Monachino's conduct "was not based on Bailey's race." The Court of Appeal adopted the City's view, noting that "Taylor-Monachino's conduct was *not* motivated by any racial animus," and therefore, Bailey could not "look to Taylor-Monachino's conduct as purported ratification of Larkin's alleged racial slur." (*Bailey*, *supra*, A153520.)

We conclude the Court of Appeal erred in dismissing the role Taylor-Monachino played in the City's overall response to Bailey's complaint. FEHA establishes a negligence standard for determining whether an employer is liable for harassment by a nonsupervisory employee. (*Roby*, *supra*, 47 Cal.4th at p. 707.) Intent is not an element of negligence. Accordingly, the City may face liability regardless of Taylor-Monachino's motives. Even if we do not consider Taylor-Monachino's conduct as evidence of further racial harassment in the workplace (as opposed to retaliatory harassment), Taylor-Monachino's conduct was part of the City's response to Larkin's use of a racial slur and should inform any analysis of whether that response was immediate and appropriate. Indeed, Taylor-Monachino was the person charged with receiving complaints of harassment in the workplace. As described below with respect to Bailey's retaliation claim, there is evidence to suggest that Taylor-Monachino sought to convey that complaints of harassment

28

would not be taken seriously and actively undermined the remedial efforts of others from her position of authority.

As stated above, the Court of Appeal did not consider that evidence regarding Taylor-Monachino's conduct in assessing the City's potential liability. The Court of Appeal also purported to "agree with the trial court" that there was no triable issue regarding the City's liability (*Bailey*, *supra*, A153520), even though the matter of immediate and appropriate corrective action was barely briefed in the City's motion for summary judgment and the trial court did not address it. In view of the foregoing, we find it appropriate to remand the matter to the Court of Appeal with directions to reconsider the issue of the City's liability for harassment in light of this opinion.

### B. Retaliation

It is unlawful for an employer to "discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (§ 12940, subd. (h).) This type of unlawful employment practice is known simply as "retaliation." (See *Yanowitz*, *supra,* 36 Cal.4th at p. 1042.) To establish a prima facie case of retaliation under FEHA, an employee must show that (1) she engaged in a "protected activity," (2) the employer subjected her to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. (*Ibid.*)

It is undisputed Bailey engaged in protected activity when she reported Larkin's use of a racial slur. This was activity for which she could not be subject to retaliation. The City moved for and obtained summary judgment, however, on the ground

that Bailey suffered no adverse employment action. The parties and the courts below analyzed this element with respect to two alleged retaliatory acts or series of acts: Taylor-Monachino's " 'course of conduct' " and comments on Bailey's June 2015 performance review. (*Bailey, supra,* A153520.) The Court of Appeal agreed with the City that neither rose to the level of an adverse employment action. (*Ibid.*) Bailey contends this holding ignores our precedent regarding the breadth of conduct that may constitute an actionable adverse employment action, as well as the mandate that such conduct be considered collectively and in context. We agree.

The phrase "adverse employment action" does not appear in FEHA but "has become a familiar shorthand expression referring to the kind, nature, or degree of adverse action against an employee that will support a cause of action under a relevant provision of an employment discrimination statute." (*Yanowitz, supra,* 36 Cal.4th at p. 1049.) We have held that the language of section 12940, subdivision (h) — making it unlawful to "discharge, expel, or otherwise discriminate against" an employee — refers to and encompasses the same forms of adverse employment actions that are actionable in FEHA discrimination claims under section 12940, subdivision (a). (*Yanowitz,* at pp. 1050–1051.) Thus, for both discrimination and retaliation claims, an adverse employment action is one that "materially affects the terms, conditions, or privileges of employment." (*Id.* at p. 1051.)[8]

---

[8] The parties apply the so-called "materiality" standard that this court adopted in *Yanowitz, supra,* 36 Cal.4th at pp. 1036, 1049–1051. Shortly after *Yanowitz* was decided, the United

Although "a mere offensive utterance or even a pattern of social slights by either the employer or coemployees" is not actionable, "the phrase 'terms, conditions, or privileges' of employment must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide." (*Yanowitz, supra,* 36 Cal.4th at p. 1054.) "Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable . . . ." (*Id.* at p. 1054.) But adverse treatment that is reasonably likely to impair an employee's job performance or prospects for advancement in their career falls within the reach of FEHA's antiretaliation provision. (*Id.* at pp. 1054–1055.)

We have recognized that "[r]etaliation claims are inherently fact-specific, and the impact of an employer's action in a particular case must be evaluated in context," considering "the unique circumstances of the affected employee as well as the workplace context of the claim." (*Yanowitz, supra,* 36 Cal.4th at p. 1052.) "[T]he significance of particular types of adverse actions must be evaluated by taking into account the legitimate interests of both the employer and the employee." (*Id.* at p. 1054.) Additionally, the alleged retaliatory acts are to

States Supreme Court rejected that standard (*Burlington N. & S. F. R. Co. v. White* (2006) 548 U.S. 53, 60, 67) in favor of a more expansive "dissuasion" standard for retaliation claims brought under Title VII (*id.* at pp. 57, 67–68). Neither Bailey nor the City asks us to reconsider *Yanowitz* in light of *Burlington*.

be considered "collectively," rather than individually. (*Id.* at pp. 1055–1056.) Retaliatory acts may take the form of "a series of subtle, yet damaging, injuries," and "[e]nforcing a requirement that each act separately constitute an adverse employment action would subvert the purpose and intent of the statute." (*Ibid.*)

Bailey argues she encountered a pattern of systemic retaliation in response to her complaint against Larkin. This pattern of retaliation includes: (1) Taylor-Monachino's obstruction of the investigation into Bailey's harassment claim by failing to submit a formal complaint on January 29 and refusing to do so again on March 23; (2) Taylor-Monachino's chastising of Bailey for recounting the January 22 incident to other employees and threatening Bailey with liability for harassing Larkin; (3) Taylor-Monachino's refusal to separate Larkin and Bailey after the January 22 incident; (4) Taylor-Monachino's hostility toward Bailey after their March 23 meeting, which included ignoring her, laughing at her, staring at her, jeering at her, and once mouthing the words "you are going to get it" to her; (5) the requirement that Bailey cover Larkin's work; and (6) the inclusion of negative comments in Bailey's 2015 performance review. Focusing largely on Taylor-Monachino's conduct, Bailey contends the department personnel officer abused her managerial authority to sabotage Bailey's complaint, punish Bailey, and protect Larkin.

In analyzing Taylor-Monachino's conduct, the Court of Appeal recited our precedent regarding what kinds of acts, such as " '[a] mere offensive utterance or even a pattern of social slights,' " fall short of constituting an adverse employment action. (*Bailey*, *supra*, A153520, quoting *Yanowitz*, *supra*, 36 Cal.4th at p. 1054.) The Court of Appeal then stated that,

"[u]nder these standards, Taylor-Monachino's 'course of conduct' does not rise to the level of an adverse employment action." (*Bailey*, *supra*, A153520.) This rather scant discussion does not demonstrate that the court gave adequate weight to Taylor-Monachino's actions in light of the totality of the circumstances. (See *Yanowitz*, at p. 1052.) Specifically, it reveals a failure to appreciate the nature of *this* conduct by *this* particular actor in the context of *this* workplace. Considering Bailey's allegations collectively and in view of the unique circumstances of the affected employee and the workplace context of her claims, we conclude that a reasonable trier of fact could find Taylor-Monachino's acts constituted a course of conduct that rises to the level of an adverse employment action.

It is important to keep in mind both Taylor-Monachino's role in the workplace and the fact that her course of conduct began with the obstruction of Bailey's complaint. In violation of policy, Taylor-Monachino did not prepare a complaint on January 29 when Bailey first reported the incident with Larkin. More critically, she then expressly refused to do so on March 23 when Bailey requested that a complaint be filed. Taylor-Monachino instead chastised Bailey for having told other employees about the incident with Larkin and threatened that, by doing so, Bailey could create a hostile work environment for Larkin, the person reported to have used a racial slur. Following Bailey and Taylor-Monachino's meeting on March 23, when it became apparent that Bailey was not prepared to drop the matter, Taylor-Monachino became openly hostile toward Bailey, ridiculing and rebuffing her, in turns. Although ignoring, laughing at, and/or staring at Bailey might be considered mere social slights or ostracism in isolation, considered together and along with Taylor-Monachino's role, her

treatment of Bailey's complaint, and her other conduct, they take on a different import. The hostility culminated in a confrontation on August 12, when Taylor-Monachino gestured at Bailey and mouthed the words "you're going to get it." The confrontation on August 12 may reasonably be interpreted as a threat, particularly given Bailey's awareness that other employees had been reassigned or separated from the office following issues with Larkin and her understanding that Taylor-Monachino played a part in those outcomes.

Critically, this course of conduct was undertaken, not by a coworker, but by the human resources manager responsible for receiving complaints of harassment and discrimination in the workplace. It bears repeating that the opportunity to seek, obtain, and hold employment without discrimination because of race is a civil right. (§ 12921, subd. (a).) A reasonable trier of fact could find that Taylor-Monachino's course of conduct, in light of her position, effectively sought to withdraw Bailey's means of reporting and addressing workplace discrimination and harassment. This is not a "[m]inor or relatively trivial" action that does no more than anger or upset the affected employee. (*Yanowitz, supra*, 36 Cal. 4th at p. 1054.) Rather, the withdrawal of an employee's right to avail themselves of the HR process typically available to other employees materially affects the "terms, conditions, or privileges" of their employment. (*Id.* at p. 1054; see *id.* at pp. 1060–1061, citing *Wyatt v. City of Boston* (1st Cir. 1994) 35 F.3d 13, 15–16 [identifying actions covered by Title VII's antiretaliation provision to include the toleration of harassment by other employees].) Such treatment is reasonably likely to impair the affected employee's job performance insofar as it leaves them unprotected from the very harms FEHA was designed to eliminate. Pointed threats

compounded the harm of Taylor-Monachino's conduct. (See *Patane v. Clark* (2d Cir. 2007) 508 F.3d 106, 116 (*Patane*) ["Any reasonable employee that believed that her employers would engage in a concerted effort to drive her from her job if she engaged in Title VII protected activity would think twice about doing so"]; cf. *Yanowitz*, at p. 1060 ["actions that threaten to derail an employee's career are objectively adverse"].)

To be clear, our opinion today does not hold that an employer's mere inaction (e.g., the failure to investigate a claim of racial harassment or take corrective action) — which separately may bear on the employer's liability for the harassment itself — constitutes an act of retaliation. Had the City merely failed to further investigate Larkin's alleged harassment following Bailey's report of the same on January 29, no actionable retaliation would appear. The instant claim of retaliation, however, is not based on mere inaction. It is based on an HR manager's purposeful obstruction of Bailey's complaint, which included an admonition that Bailey might create a hostile work environment for her harasser if she persisted. And it is based on Taylor-Monachino's escalating threats in August, when she mouthed the words, "you are going to get it." Though ultimately it is for a jury to decide whether Taylor-Monachino's conduct rises to the level of an adverse employment action in this case, such conduct could be understood as quintessentially retaliatory. That is, it appears designed to punish Bailey for engaging in protected activity (i.e., pursuing her complaint of harassment) and threatens further punishment should she persist. Where a supervisor or other person of authority obstructs and threatens to punish a reporting employee if she persists in bringing a complaint to

higher level officials, such acts may be considered by a jury to constitute actionable retaliation.

The City's response to the retaliation claim confirms that there exists a triable issue of fact. The City argues snubs or social slights in the workplace are not actionable. As discussed above, however, Bailey has shown more than mere impolite behavior. The City further argues that Taylor-Monachino's obstruction of Bailey's complaint "is not actionable" because a complaint "was in fact submitted to the City's DHR." The incident with Larkin occurred in January and a complaint was not filed with DHR until April; Bailey provides evidence that, in the meantime, Taylor-Monachino obstructed the filing of a complaint. Whether the eventual filing of a complaint with DHR impacts the retaliatory effect of Taylor-Monachino's conduct is a question for the trier of fact. (See *Patane, supra,* 508 F.3d at p. 116 [characterizing a similar argument as "entirely unconvincing, since it would require that *no* plaintiff who makes a second complaint about harassment could *ever* have been retaliated against for an earlier complaint"].) The City also characterizes Taylor-Monachino's threat on August 12 as "empty." That too is a question for a jury. Given that this threat followed shortly on the heels of DHR issuing a letter declining to investigate Bailey's complaint against Larkin and Taylor-Monachino, a jury might find that Taylor-Monachino had (or believed she had) greater license to target Bailey at that time. Bailey stated she was aware that other employees had been reassigned or separated from the office following incidents with Larkin, and Bailey attributed these outcomes, at least in part, to Taylor-Monachino's influence. Mark had previously worked in the records room with Bailey and Larkin but was reassigned after complaints from Larkin. Indeed, it was Bailey's

knowledge about these other employees that caused her initial reluctance to report the incident with Larkin on January 22. Of course, we express no view as to what a trier of fact will or should conclude about this evidence; we hold, however, that it is sufficient to survive summary judgment and put the matter of whether Bailey suffered an adverse employment action to a jury.[9]

## III. DISPOSITION

For the reasons stated above, we conclude that an isolated act of harassment is actionable if it is sufficiently severe under the totality of the circumstances, and that a coworker's use of an unambiguous racial epithet, such as the N-word, may be found to suffice. Applying this standard, there exists a triable issue of fact whether the harassing conduct at issue here was sufficiently severe so as to alter the conditions of Bailey's employment. As to the matter of the City's liability for the harassment, the Court of Appeal erred in failing to consider the effect of Taylor-Monachino's conduct. We find it appropriate to remand the matter to the Court of Appeal for reconsideration of that issue in light of this opinion. We further conclude that there exists a triable issue of fact whether Taylor-Monachino's course of conduct adversely affected the terms and conditions of

---

[9] The City argues that Bailey's June 2015 performance review does not constitute an adverse employment action, and, even if it did, there is no causal link between negative feedback provided as part of that review and Bailey's complaint. Because we conclude that Bailey's claim of retaliation survives summary judgment based on Taylor-Monachino's course of conduct, we need not consider the matter of her performance review. For purposes of summary judgment, it was undisputed that Taylor-Monachino's conduct towards Bailey was in retaliation for Bailey's complaint against Larkin.

Bailey's employment by, among other things, withdrawing Bailey's right to avail herself of the human resources process available to other employees. We therefore reverse the judgment of the Court of Appeal and remand the cause to that court for further proceedings consistent with this opinion.[10]

**EVANS, J.**

**We Concur:**

**GUERRERO, C. J.**
**CORRIGAN, J.**
**LIU, J.**
**KRUGER, J.**
**GROBAN, J.**
**JENKINS, J.**

---

**10** The trial court granted summary judgment in favor of the City on Bailey's claims for discrimination and failure to prevent discrimination, reasoning these claims were entirely dependent on her claims for harassment and retaliation. The Court of Appeal did not address the dependent claims. In their briefing before this Court, the parties dispute whether reversal of the Court of Appeal's judgment revives the discrimination and failure to prevent discrimination claims. As it was neither addressed by the Court of Appeal below nor presented as an issue for our review, we decline to address the matter in the first instance. The parties may raise the matter before the Court of Appeal on remand.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion**  Bailey v. San Francisco District Attorney's Office

_____

<u>Procedural Posture</u> (see XX below)
**Original Appeal**
**Original Proceeding**
**Review Granted (published)**
**Review Granted (unpublished)** XX NP opn. filed 9/16/20 – 1st Dist., Div. 1
**Rehearing Granted**

_____

**Opinion No.** S265223
**Date Filed:** July 29, 2024

_____

**Court:**  Superior
**County:**  San Francisco
**Judge:**  Harold E. Kahn

_____

**Counsel:**

Law Offices of Daniel Ray Bacon, Daniel Ray Bacon; and Robert L. Rusky for Plaintiff and Appellant.

Stacy Villalobos and Christopher Ho for Legal Aid at Work, ACLU Foundation of Northern California, Bet Tzedek Legal Services, Center for Workers' Rights, Earthlodge Center for Transformation, Equal Justice Society, Impact Fund, Maintenance Cooperation Trust Fund, National Employment Law Project and Worksafe as Amici Curiae on behalf of Plaintiff and Appellant.

Dennis J. Herrera and David Chiu, City Attorneys, Katharine Hobin Porter and Jonathan Rolnick, Chief Deputy City Attorneys, Boris Reznikov, Neha Gupta and Tara M. Steeley, Deputy City Attorneys, for Defendants and Respondents.

Renne Public Law Group, Arthur A. Hartinger, Ryan P. McGinley-Stempel and Anastasia Bondarchuk for California State Association of

Counties and League of California Cities as Amici Curiae on behalf of Defendants and Respondents.

Horvitz & Levy, Bradley S. Pauley and Eric S. Boorstin for the Association of Southern California Defense Counsel as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Daniel Ray Bacon
Law Offices of Daniel Ray Bacon
569 Hayes Street, Suite One
San Francisco, CA 94102
(415) 864-0907

Stacy Villalobos
Legal Aid at Work
180 Montgomery Street, Suite 600
San Francisco, CA 94104
(415) 593-0140

Tara M. Steeley
Deputy City Attorney
1 Dr. Carlton B. Goodlett Place
City Hall, Room 234
San Francisco, CA 94102
(415) 554-4655